UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

| | |
|---|---|
| In re:<br>Pyramid Quality Solutions & Innovations, Inc.<br>(01-0560606)<br>2075 W. Big Beaver Rd., Suite 415<br>Troy, MI 48084<br>        Debtor-in-Possession | )<br>)<br>)<br>)<br>)<br>) | Case No: 18-52932<br><br>Chapter 11<br><br>Hon. Mark A. Randon |

## COVER SHEET FOR MOTION TO USE CASH COLLATERAL OR TO OBTAIN CREDIT

   The debtor has filed a motion to use cash collateral or to obtain postpetition financing, which is attached to this Cover Sheet. In accordance with LBR 4001-2(b) (E.D.M.), the debtor has identified below, by page and paragraph number, the location in the proposed order accompanying the motion of each of the following provisions:

| Provision | Contained in Proposed Order | Location in Proposed Order |
|---|---|---|
| (1) Provisions that grant liens on the estate's claims and causes of action arising under Chapter 5 of the Code. | __X__ Yes<br><br>_____ No | Page ____, ¶ __32__ |
| (2) Provisions that grant cross-collateralization protection to the prepetition secured creditor (i.e., clauses that secure prepetition debt with categories of collateral that were not covered by the secured party's lien prepetition) other than liens granted solely as adequate protection against diminution in value of a prepetition creditor's collateral. | _____ Yes<br><br>__X__ No | Page ____, ¶ _____ |

| | | |
|---|---|---|
| (3) Provisions that establish a procedure or conditions for relief from the automatic stay. | __X__ Yes<br><br>_____ No | Page ____, ¶ __12__ |
| (4) Provisions regarding the validity or perfection of a secured creditor's prepetition liens or that release claims against a secured creditor. | __X__ Yes<br><br>_____ No | Page ____, ¶ 4 & 5 |
| (5) Provisions that prime any lien without that lienholder's consent. | __X__ Yes<br><br>_____ No | Page ____, ¶ __41__ |
| (6) Provisions that relate to a sale of substantially all of the debtor's assets. | __X__ Yes<br><br>_____ No | Page ____, ¶ __20__ |
| (7) Provisions for the payment of professional fees of the debtor or any committees, including any carve-outs for such payments. | __X__ Yes<br><br>_____ No | Page ____, ¶ __32__ |
| (8) Provisions for the payment of prepetition debt. | __X__ Yes<br><br>_____ No | Page ____, ¶ __11__ |
| (9) Provisions that waive the debtor's exclusive right to file or solicit acceptances of a plan during the time periods specified in 11 U.S.C. § 1121. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (10) Provisions that require the debtor's plan to be on terms acceptable to the secured creditor. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (11) Provisions that require or prohibit specific terms in the debtor's plan. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |

| | | |
|---|---|---|
| (12) Provisions establishing that proposing a plan inconsistent with the order constitutes a default. | __X__ Yes<br><br>_____ No | Page ____, ¶ 18(xi) |
| (13) Provisions that waive surcharge under 11 U.S.C. § 506(c). | __X__ Yes<br><br>_____ No | Page ____, ¶ __36__ |
| (14) Provisions that address the rights and obligations of guarantors or co-obligors. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (15) Provisions that prohibit the debtor from seeking approval to use cash collateral without the secured creditor's consent. | _____ Yes<br><br>__X__ No | Page ____, ¶ ____ |
| (16) Provisions that purport to bind a subsequent trustee. | __X__ Yes<br><br>_____ No | Page ____, ¶ __40__ |
| (17) Provisions that obligate the debtor to pay any of a secured creditor's professional fees. | __X__ Yes<br><br>_____ No | Page ____, ¶ 9,24,29 |

Respectfully Submitted,

_/s/ Brian A. Rookard_
Edward J. Gudeman (P-14454)
Brian A. Rookard (P-69836)
Gudeman and Associates, P.C.
Counsel for Debtor-in-Possession
1026 West 11 Mile Road
Royal Oak, MI 48067
Telephone: 248-546-2800
ejgudeman@gudemanlaw.com

Dated: October 1, 2018

3

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

| | |
|---|---|
| In re: | ) |
| Pyramid Quality Solutions & Innovations, Inc. | ) Case No: 18-52932 |
| (01-0560606) | ) |
| 2075 W. Big Beaver Rd., Suite 415 | ) Chapter 11 |
| Troy, MI 48084 | ) |
| Debtor-in-Possession | ) Hon. Mark A. Randon |

**VERIFIED EMERGENCY MOTION FOR INTERIM ORDER (I)
AUTHORIZING THE DEBTOR TO SELL ACCOUNTS RECEIVABLE
AND/OR A POST-PETITION ACCOUNTS RECEIVABLE FACTOR
PROGRAM WITH COMMERCIAL FUNDING INC., AND SELL CERTAIN
ACCOUNTS RECEIVABLE PURSUANT TO 11 U.S.C. SECTIONS 363(b) AND
(f); (II) GRANTING CFI SECURITY INTERESTS PURSUANT TO 11 U.S.C.
SECTIONS 364(c), 364(d)(1), 364(e), AND 507; AND (III) AUTHORIZING
DEBTOR'S USE OF CFI'S CASH COLLATERAL PURSUANT TO 11 U.S.C.
SECTION 363(c)(2), AND SCHEDULING A FINAL HEARING**

NOW COMES, Pyramid Quality Solutions & Innovations, Inc., (the "Debtor" or

"Pyramid"), by and through undersigned counsel, files this Motion (the "Motion") for entry of an

emergency and/or interim and final order authorizing the Debtor to (I) enter into a post-petition invoice

purchase/sale agreement (the "Post-Petition Invoice Purchase/Sale Agreement") and security agreement,

together with certain related documents (collectively, the "Post-Petition Invoice Purchase/Sale

Arrangement") with Commercial Funding Inc. ("CFI"); (II) sell certain accounts receivable to CFI

pursuant to §§363(b) and (f) of Title 11 of the United States Code (the "Bankruptcy Code") and to grant

security interests and a super-priority administrative expense priority to CFI pursuant to § § 364(c),

364(d)(1), 364(e), and 507 of the Bankruptcy Code; and (III) use collateral of CFI in connection with

the Post-Petition Factoring Arrangement pursuant to Section 363(c)(2) of the Bankruptcy Code, and in

support thereof respectfully represents as follows:

4

**Jurisdiction and Venue**

1.	This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334. The statutory predicates for the relief sought herein are §§363(b) and (f), 364(c), 364(d)(1), 364(e), and 507 of the Bankruptcy Code, and Bankruptcy Rules 2002, 4001, 6004 and 9014. Consideration of the Motion is a core proceeding pursuant to 28 U.S.C. §157(b). Venue is proper before this Court pursuant to 28 U.S.C. §1409.

**Background**

2.	On September 21, 2018 (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code and has continued in the management and operation of its business and property as a debtor-in-possession pursuant to §§1107 and 1108 of the Bankruptcy Code.

3.	No committee or trustee has been appointed in the case.

**Description of the Debtor**

4.	The Debtor is a Michigan corporation having its headquarters located at 2075 W. Big Beaver Road, Troy, Michigan, 48084. The Debtor is engaged primarily in the business of quality and industrial engineering for various Tier I, Tier II, military, and other suppliers. In essence, the Debtor provides services such as sorting and inspection and other problem solving services when parts are defective, an assembly line stops, and the problem needs to be located and "contained." Also, Debtor performs logistics for the military.

5.	The Debtor does have an office building, with the regular accoutrements, including computers, and other office furniture, and supplies. The business does not have its own capital equipment. The Debtor basically supplies the trained workforce to go to various customer locations to perform the containment work.

5

6. In recent months, a very large customer was lost, causing immediate cash flow problems when the business did not adjust its workforce quickly enough to accommodate the loss in revenue. This led the business to seek short term loans to make ends meet. Not surprisingly, this led to further cash flow problems, and further short terms loans.

7. More recently, the Debtor has its existing work, and has located new customers for its services. However, the cash crunch became so acute that the Debtor needed bankruptcy relief to reorganize.

**Post-Petition Financing**

8. On September 27, 2018, Debtor, the United States Trustee, and The Huntington National Bank entered into a stipulation for the use of cash collateral, granting replacement liens to The Huntington National Bank, and agreed to make adequate protection payments to the Huntington National Bank and other potentially secured creditors. Debtor has determined that it will not be able to continue to operate even with the use of cash collateral and needs an infusion of new funds for working capital.

9. Prior the bankruptcy filing, Jacqueline Burkette and Ossie Nunn, sought to have The Huntington National Bank subordinate its lien to Crestmark Capital so that Crestmark could provide the factoring that Debtor needed, and Huntington said no. A plan was actually submitted to Huntington for these purposes.

10. Debtor's counsel discussed with The Huntington National Bank's counsel various issues regarding cash collateral, and at that time the Debtor's intent to seek factoring of its future account receivables. It was Debtor's counsel's understanding that The Huntington National Bank had not contemplated additional financing because the account had been placed in "Special Assets," putting the business in jeopardy. In fact, it was the President of the Debtor's communications with The

6

Huntington National Bank, and its placement of the account in collections that was one of the primary reasons Debtor sought bankruptcy relief.

11.     Furthermore, many of the creditors of the Debtor are not lenders to begin with, but are "merchant cash advance" companies and are not in the business of DIP financing.

12.     The Debtor contacted a financing broker, and the only lender willing to make a debtor in possession financing loan is CFI.

13.     CFI has previously made debtor in possession loans, is aware of the terms necessary for them to agree to make such loans, and is not willing to lend to Debtor on any less favorable terms than those in the attached proposed Order.

14.     The terms of CFI's debtor in possession loan follow:

| | |
|---|---|
| Maximum Advances: | $200,000.00 |
| Advance Rate: | 85% of the net collectible value of each account. |
| Service Fee: | 1.90% first 30 days, 0.75% every 10 days thereafter |
| Monthly Minimum Fee: | 0.75% of the maximum advances per month. |
| Recourse: | Accounts are purchased with 90 day recourse/chargeback |
| Due Diligence Fee: | $750.00 |
| Audits: | CFI may require audits from time to time and Debtor is responsible for out of pocket expenses. |
| Contract Term: | One (1) year. |
| Collateral: | Accounts receivable, chattel paper, contract rights, general intangibles, books and records, as well as proceeds and general security interest in all assets. |
| Other conditions: | DIP Facility to be cross-collateralized and cross-defaulted to any other obligations of the Debtor. Also, support documentation that services were rendered / product delivered. |

7

| Guaranty: | Guaranty by principal shareholder. Corporate guaranty from parent / subsidiaries (if applicable). |

The above terms are contained in the Letter of Intent from CFI. See ***Exhibit A***.

15.     Absent this infusion of new funds, Debtor does not believe that it will be able to continue to operate. Debtor is primarily in the business of providing services and the new funds are necessary to make the payroll needed immediately to retain its employees, the service-providers.

16.     If Debtor is unable to continue to operate, it will have to liquidate, and the value of its assets will be significantly less than if it is able to continue to operate.

17.     In order to preserve its ongoing business and going concern, the Debtor requires post-petition financing, known as factoring, of its accounts receivables. CFI has agreed, on an interim basis, to purchase accounts and make post-petition advances against same to the Debtor in an amount not to exceed $200,000.00, pursuant to sections 363(b) and (f), and 364(c), 364(d)(1), 364(e) of the Bankruptcy Code and Bankruptcy Rules 2002, 4001 and 9014 (the "Post-Petition Invoice Purchase/ Sale Arrangement"). This Motion requests that the Court grant emergency relief and schedule further interim and/or final hearings to consider approval of the Post-Petition Invoice Purchase/Sale Arrangement on a further interim and/or final basis.

18.     The Debtor has no unencumbered funds or credit available to fund its business operations. CFI has agreed to continue to fund the Debtor's operation under a Post-Petition Invoice Purchase/Sale Arrangement through the purchase of the Debtor's accounts receivable. Without the funding from CFI under the Post-Petition Invoice Purchase/Sale Arrangement, the Debtor's operations will be irreparably harmed. Therefore, it is imperative that the Debtor be authorized to enter into an account purchase/sale arrangement with CFI Post-Petition in order to preserve the business. A copy of the Letter of Intent for purchase of the post-petition accounts receivable is attached hereto as ***Exhibit***

*"A"* and incorporated herein by reference. A copy of the Post-Petition Invoice Purchase/Sale Agreements is attached hereto as *Exhibit "B"* and incorporated herein by reference.

19.     To continue its business operation, the Debtor must be able to provide comfort to its clients, personnel and vendors that it will be able to pay in the ordinary course for all post-petition purposes including wages. Continuing its invoice purchase/sale arrangement with CFI will provide the Debtor with the cash liquidity necessary to operate its business and to pay the wages, salaries, insurances, and other expenses associated with running the Debtor's business.

20.     In order to avoid immediate and irreparable harm to the Debtor pending the final hearing, the Debtor asks the Court to allow it to enter into the purchase/sale arrangement with CFI under the Post-Petition Invoice Purchase/Sale Arrangement immediately.

21.     Accordingly, the Debtor seeks entry of an order, in the form attached hereto as *Exhibit "C"* (the "Proposed Order"), authorizing it to enter into the Post-Petition Invoice Purchase/Sale Agreement, and sell its accounts receivable with CFI under the Post-Petition Invoice Purchase/Sale Agreement, as follows:

> a.      Subject to the terms of the Post-Petition Invoice Purchase/Sale Agreement, CFI shall continue to advance eighty-five (85%) percent of the face amount of the account receivable purchased and remit that balance upon collection of the invoice, subject to chargebacks by the account debtor and CFI's fees.

> b.      All accounts receivable sold or otherwise transferred from the Debtor to CFI under the Post-Petition Invoice Purchase/Sale Agreement shall be the sole property of CFI and shall be transferred free and clear of all liens, claims and encumbrances, pursuant to §363(f) of the Bankruptcy Code.

> c.      To secure all of the Debtor's obligations to CFI under the Post- Petition Invoice Purchase/Sale Agreement, CFI shall be granted, pursuant to § § 364 (c), 364(d)(1), 364(e), and 507 of the Bankruptcy Code, a valid, perfected and enforceable first priority security interest in and lien on all of the Debtor's accounts and their proceeds and a subordinate lien on all other collateral described in the Post-Petition Invoice Purchase/Sale Agreement, together with all proceeds and profits derived therefrom,

without the necessity for making any filings under the Uniform Commercial Code or otherwise.

d.      Fees and expenses incurred by CFI in connection with the post-petition invoice purchase/sale arrangement shall be charged and paid as provided in the Post-Petition Invoice Purchase/Sale Agreement.

e.      The Debtor's Plan of Reorganization in this bankruptcy will provide that CFI's rights are not impaired or modified to any extent absent the express written consent of CFI.

f.      Debtor's administrative expenses for fees and costs will be paid by Debtor from the sale proceeds of post-petition invoices purchased by CFI, subject to the approval by the Bankruptcy Court of the administrative expenses, and counsel shall file its disclosure with the Court of any payments under Rule 2016(b).

22.     The Debtor respectfully submits that the foregoing invoice purchase/sale arrangement is in the best interest of the estate and its creditors and should be approved.

23.     Section 363(b) of the Bankruptcy Code provides that the Debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b). Section 363(f) of the Bankruptcy Code permits the Debtor to sell property under §363(b) free and clear of liens and claims of other entities if such entities consent or if any of the other safe-harbors are present. Here, the requirements of section 363(f) are satisfied because the parties with interests in the receivables will either consent to the sale, or if they do not consent, section 363(f)(5) would be satisfied because "such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest" in a chapter 11 reorganization. Moreover, with

a)      regard to Financial Agent Services, this creditor only perfected its security interest immediately prior to the petition filing and therefore is avoidable as a preference.

b)      Section 364 of the Bankruptcy Code provides in relevant part.

c)      If the trustee is unable to obtain unsecured credit allowable under section

10

503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1)      with a priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)      secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)      secured by a junior lien on property of the estate is subject to a lien.

d)    The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(1)      the trustee is unable to obtain such credit otherwise; and

(2)      there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

24.      Pursuant to this Motion, CFI is seeking a priority first position security interest on accounts and their proceeds and a subordinate lien on all other assets

**Request for Authority To Use Cash Collateral**

25.      The Debtor further submits this Motion pursuant to Bankruptcy Code §363(c)(2)(B) and 361 and 362 and Bankruptcy Rule 4001(b) with respect to the Debtor's request for authority to use the proceeds of the Post Petition Factoring which constitute CFI's collateral ("Cash Collateral"), substantially in accordance with the terms and conditions set forth in the proposed Interim Order (the "Order") attached hereto as ***Exhibit "C."*** CFI will have a perfected security interest in the Debtor's property, which may constitute, *inter alia*, Cash Collateral senior to all other creditors, including The

11

Huntington National Bank. The Debtor has already used some of the cash collateral pursuant to Interim Cash Collateral Orders (**Dk # 34**). Debtor will continue to provide Huntington Bank adequate protection for any amounts due under its lien that are being subordinated to CFI.

26. The proposed Order grants the Debtor, *inter alia*, the authority to use the Cash Collateral pursuant to Bankruptcy Code §§363 (c)(1) and (2) and Bankruptcy Rule 4001(c) to the extent necessary to continue the operation of its business and to preserve the value of its estate during the course of the Chapter 11 case.

27. Section 363(a) of the Bankruptcy Code states as follows:

"In this section, "cash collateral" means cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estate and an entity other than the estate have an interest and includes the proceeds, products, offspring, rents, or profits of properties subject to a security interest as provided in Section 552(b) of this title, whether existing before or after the commencement of a case under this title."

28. Section 363(c)(1) of the Bankruptcy Code provides as follows:

"(c)(1) If the business of the debtor is authorized to be operated under section 721, 1108, 1304, 1203, or 1204 of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing."

29. Section 363(d) of the Bankruptcy Code provides as follows:

"(d) The trustee may use, sell, or lease property under subsection (b) or (c) of this section only to the extent not inconsistent with any relief granted under section 362(c), 362(e), or 362(f) of this title".

30. Accordingly, pursuant to § 363(c)(2) of the Bankruptcy Code, the consent of the Secured Creditors or authority from this Court is required to use Collateral in which they hold perfected security interests.

12

## Adequate Protection

31.     Adequate protection is designed to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization. *In re Nice*, 355 B.R. 554, 563 (Bankr. N.D. Va. 2006) ("adequate protection is solely a function of preserving the value of the creditor's secured claim as of the petition date due to a debtor's continued use of the collateral").

32.     Because the term "adequate protection" is not defined in the Bankruptcy Code, the precise contours of the concept are necessarily determined on a case-by-case basis. *MBank Dallas, N.A. v. O'Connor (In re O'Connor)*, 808 F.2d 1393 (10th Cir. 1987). *In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1086); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996); *In re Beker Industries Corp.*, 58 B.R. 725 (Bankr. S.D.N.Y. 1986); see also *In re JKJ Chevrolet, Inc*. 190 B.R. 542, 545 (Bankr. E.D.Va. 1995) (adequate protection is a flexible concept that is determined by considering the facts of each case).

33.     The Order provides that, for Debtor's use of cash collateral Debtor will provide adequate protection in the form of replacement liens subject to CFI's interests with respect to accounts and their proceeds, to the extent that Huntington Bank or any other creditor had or has valid security interests in pre-petition assets of this kind on the Petition Date and in the continuing order of nature, extent, validity and priority that existed as of the Petition Date subject to CFI's claims and interests.

34.     The Debtor submits that, in order to preserve the Debtor's estate and ensure the viability of the Debtor during the Chapter 11 case, CFI should be granted the post-petition liens described herein.

## The Budget

35.     The Debtor proposes to use proceeds or advances from the sale of accounts by Debtor to CFI only for ordinary and necessary limited operating expenses in connection with the ordinary operation of the Debtor's business substantially in accordance with the operating budget annexed

hereto as ***Exhibit "D"*** (the "Budget"). The Debtor believes that the Budget includes all reasonable, necessary and foreseeable expenses to be incurred in the ordinary course of operating the Debtor's business for the period set forth in the Budget. The Debtor believes that the use of the proceeds from the sale of accounts to CFI in accordance with the Budget will provide the Debtor with adequate liquidity to pay ordinary course payable administrative expenses as they become due and payable during the period covered by the Budget without any significant diminution in value of the Collateral.

36.     All accounts will be collected in the manner provided in the Post-Petition Invoice Purchase/Sale Agreement and CFI will be the owner of the accounts, as provided therein. The proceeds of the accounts sold to CFI that are paid by account debtors will be delivered to CFI as provided in such Post-Petition Invoice Purchase/Sale Agreement without further order of the court. The Debtor and CFI will apply the sums collected, chargebacks, discounts, fees, and charges, transfer all accounts receivable, and otherwise administer the Post-Petition Invoice Purchase/Sale Agreements in the ordinary course of business pursuant to the terms of such agreements, without further order of the court. Because the transaction is a post-petition transaction, the automatic stay is modified to permit CFI to enforce its rights and remedies without further order of the court.

37.     It is submitted that in light of (a) the "equity cushion" in the Debtor's receivables and (b) the adequate protection being proposed herein, Huntington and the other claimants asserting a lien on the cash collateral will be adequately protected for the use of the cash collateral.

## PROCEDURAL BASIS FOR RELIEF REQUESTED

38.     Federal Rule of Bankruptcy Procedure 9006(c) provides as follows:

> *(b)     Reduction.*
> (1)     *In General*. Except as provided in paragraph (2) of this subdivision, when an act is required or allowed to be done at or within a specified time by these rules or by a notice given thereunder or by order of court, the court for

14

cause shown may in its discretion with or without motion or notice order the period reduced.

(2) *Reduction Not Permitted*. The court may not reduce the time for taking action under Rules 2002 (a)(4) and (a)(8), 2003(a), 3002(c), 3014, 3015, 4001(b)(2), (c)(2), 4003(a), 4004(a), 4007(c), 8002, and 9033(b).

39.     Thus, the Federal Rules of Bankruptcy Procedure specifically authorize the Court to hear an application such as the Application herein on shortened notice, for cause shown.

40.     The Debtor respectfully submits that sufficient cause exists for scheduling a preliminary hearing on shortened notice to consider the Application and refers the Court to the Declaration of Brian Rookard, Esq. pursuant to Local Bankruptcy Rule 9077-1(a) in support of an order scheduling hearing on shortened notice, submitted herewith.

## Request For Waiver Of Stay

41.     The Debtor further seeks a waiver of the stay of the effectiveness of the Order that may be imposed by any applicable Bankruptcy Rule. As set forth above, the use of Collateral is essential to prevent potentially irreparable damage to the Debtor's value and ability to reorganize. Accordingly, the Debtor submits that sufficient cause exists to justify a waiver of any stay imposed by the Bankruptcy Rules, to the extent applicable.

## Notice

42.     This Motion is being served on notice to the Secured Creditors, all other parties asserting secured claims against the Debtor, the United States Trustee and all other parties entitled to notice pursuant to Bankruptcy Rule 4001(c) and (d), including but not limited to the Debtor's twenty (20) largest unsecured creditors.

**WHEREFORE**, the Debtor, respectfully requests that this Honorable Court authorize the Debtor to: (1) enter into the Post Petition Invoice Purchase/Sale Agreement and sell its accounts to CFI

15

thereunder; and (2) use the cash collateral, all in accordance with the terms of the attached proposed Order and this Application, together with such other and further relief as is just and proper.

Respectfully submitted,

GUDEMAN & ASSOCIATES, PC

*/s/ Brian A. Rookard*
Edward J. Gudeman (P14454)
Brian Ashley Rookard (P69836)
Attorney for Debtor
1026 W. Eleven Mile Road
Royal Oak, MI 48067
(248) 546-2800
Email: ejgudeman@gudemanlaw.com

Dated: October 1, 2018

## **VERIFICATION AND ACKNOWLEDGEMENT**

I swear/affirm under penalty of perjury that I have read the foregoing Verified Motion and that the statements set forth therein are true and correct to the best of my knowledge.

/s/ *Jacqueline Burkette*

Pyramid Quality Solutions & Innovations, Inc.

By: Jacqueline Burkette, President

16

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### NORTHERN DIVISION

| | |
|---|---|
| In re:<br>Pyramid Quality Solutions & Innovations, Inc.<br>(01-0560606)<br>2075 W. Big Beaver Rd., Suite 415<br>Troy, MI 48084<br><div align="right">Debtor-in-Possession</div> | Case No: 18-52932<br><br>Chapter 11<br><br>Hon. Mark A. Randon |

**NOTICE OF DEBTOR'S MOTION FOR INTERIM ORDER (I)
AUTHORIZING THE DEBTOR TO SELL ACCOUNTS RECEIVABLE
AND/OR A POST-PETITION ACCOUNTS RECEIVABLE FACTOR
PROGRAM WITH COMMERCIAL FUNDING INC., AND SELL CERTAIN
ACCOUNTS RECEIVABLE PURSUANT TO 11 U.S.C. SECTIONS 363(b) AND
(f); (II) GRANTING CFI SECURITY INTERESTS PURSUANT TO 11 U.S.C.
SECTION 364(c), 364(d)(1), 364(e), AND 507; AND (III) AUTHORIZING
DEBTOR'S USE OF CFI'S CASH COLLATERAL PURSUANT TO 11 U.S.C.
SECTION 363(c)(2), AND SCHEDULING A FINAL HEARING**

Debtor has filed papers with the Court for entry of an order allowing the factoring of its account receivables, granting super-priority liens, granting adequate protection, setting a final hearing on the motion, and other related relief.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney. (If you do not have an attorney, you may wish to consult one.)**

If you do not want the Court to enter an order granting Defendant the requested relief, or if you want the Court to consider your view on the Motion, within (14) fourteen days, you or your attorney must:

1.     File with the Court a written response or an answer, explaining your position, at: United States Bankruptcy Court 211 West Fort Street, Suite 2100, Detroit, MI 48226

If you mail your response to the Court for filing, you must mail it early enough so that the Court will **receive** it on or before the date stated above.

You must also mail a copy to:

Gudeman & Associates, P.C.
1026 W. Eleven Mile Rd.
Royal Oak, MI 48067

2.     If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with notice of the date, time and location of that hearing.

**If you or your attorney do not take these steps, the Court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

Respectfully Submitted,

*/s/ Brian A. Rookard*
Brian A. Rookard (P-69836)
Gudeman & Associates, P.C.
Attorneys for Debtor / Defendant
1026 W. Eleven Mile Rd.
Royal Oak, MI 48067
(248) 546-2800
brookard@gudemanlaw.com

Dated: October 1, 2018

18

# EXHIBIT A



September 26, 2018

Mr. Ossie Nunn
**Pyramid Quality Solutions & Innovations, Inc.**
2075 W. Big Beaver Road, Suite 415
Troy, MI 48084

Dear Mr. Nunn,

This Letter of Intent and informational discussion sheet (the "<u>Discussion Sheet</u>") is intended to provide you with an indication of Commercial Funding, Inc.'s ("CFI") interest in financing **Pyramid Quality Solutions & Innovations, Inc.** ("Client") post-petition accounts receivable (the "<u>Accounts</u>") in connection with your debtor-in-possession case proceeding under Chapter 11 of the Bankruptcy Code (the "<u>DIP Facility</u>"). Please be advised that issuance of this Letter of Intent in accordance with the terms and conditions stated below should not be considered a commitment on CFI's part to provide financing to Client.

| | |
|---|---|
| **Maximum Advances:** | Two Hundred Thousand Dollars ($200,000.00) |
| **Advance Rate:** | Eighty-Five percent (85%) of the approved net collectible value of each Account that CFI elects to purchase. |
| **Service Fee:** | A service fee of One and Nine Tenths of One Percent (1.90%) of the face amount of each purchased Account per diem for the first thirty (30) days; Three Quarters of one percent (0.75%) for each ten (10) days thereafter. |
| **Monthly Min. Fee:** | Three Quarters of One Percent (.75%) of the Maximum Advances per month. (Client is only charged the difference between the Monthly Minimum Fee and the fees paid if the Monthly Minimum Fee is greater). |
| **Recourse:** | All Accounts are purchased from Client with a Ninety (90) day recourse/chargeback provision. |
| **Due Diligence Fee:** | Client shall pay CFI a non-refundable documentation and due diligence fee of Seven Hundred Fifty Dollars ($750.00) at the time of Client's acceptance of this proposal. Client hereby authorizes CFI to accept payment instructions for Due Diligence Fees and other payments via telephone or electronic authorization from any employee of Client. |
| **Audit:** | CFI may require audits from time to time which Client agrees to pay CFI for all reasonable out-of-pocket expenses for performing such audit. |
| **Contract Term:** | The contract term shall be one (1) year from the date of initial Advance of Accounts. |
| **Collateral:** | Client will be required to grant at a minimum to CFI a first priority perfected security interest in Client's accounts receivable, chattel paper, contract rights, general intangibles, books and records, and all proceeds of the foregoing as well as a general security interest in all assets. |
| **Other Conditions:** | Customary, including, but not limited to the following:<br>a) Facility shall be cross-collateralized and cross-defaulted to any other obligations Client may have now or in the future with CFI, its subsidiaries or affiliates;<br>b) Support Documentation that services have been rendered or product has been delivered. |

170 S. Main Street
Suite 700
Salt Lake City, Utah 84101
866.222.2396 • 801.575.6500 • Fax: 801.575.6507 • Website: www.commercialfund.com

1

**Guarantees:**    Personal Guaranty from principal shareholder(s); Corporate Guaranty's from parent company and all wholly owned subsidiaries, if applicable.

Client shall have complied in full with the notice and other requirements of the Bankruptcy Code in a manner acceptable to CFI and its counsel, and interim financing orders (in form and substance reasonably satisfactory to CFI and its counsel) shall have been entered by the Bankruptcy Court and which shall provisions include, inter alia, (a) authorizing the secured financing under the DIP Credit Facility on the terms and conditions contemplated by this Discussion Sheet; (b) modifying the automatic stay; (c) authorizing and granting the security interests and liens described above, (d) granting a super-priority administrative expense claim to CFI with respect to all obligations to CFI and CCG, subject to no priority claim or administrative expenses of the Chapter 11 Cases of Debtor or any other entity, that any future proceeding which may develop out of any such cases, including liquidating in bankruptcy, (e) a "good faith finding under Section 364(e) of the Bankruptcy Code, and (f) such other terms and provisions as CFI and its counsel shall require. The interim financing orders shall authorize sales and /or financing under the DIP Facility for the Debtor for a period not to exceed thirty (30) days in an amount acceptable to CFI in its sole discretion and shall contain such other terms and conditions as CFI and its counsel shall require.

Client warrants that all information which has been, and will be, submitted by Client is true and correct as of the stated date and shall immediately notify CFI of any material change in any facts represented to CFI. As a condition to CFI entering into any loan, there shall not have been any material adverse change in the business, financial condition, prospects of the borrower(s) and any guarantors from the date of the financial information submitted to CFI. By executing this Letter of Intent of proposed terms, Client authorizes all companies, with whom it conducts business, all consumer reporting agencies or other persons or organizations, and all banks or other financial institutions, to release to CFI, any and all credit and financial information relating to Client that CFI deems necessary, and Client authorizes CFI to file a UCC-1 financing statement on the collateral upon receiving the executed Purchase and Sale Agreement and Supporting documentation. Consummation of a transaction consistent with this approval is subject to: (i) final approval by CFI's credit committee in its sole discretion, (ii) CFI standard documentation properly executed by officers of the borrower, subject to approval of CFI and its counsel in form and substance, (iii) first priority security interest (perfected first lien) in the collateral prior to funding.

The foregoing is intended to summarize certain basic terms of the DIP Facility and is not intended to be a definitive list of all the requirements of CFI in connection with the DIP Facility. Funding is subject to the completion, to our satisfaction, of our due diligence. Should this Letter of Intent of proposed terms be terminated for any reason, CFI will not be held liable.

Thank you for giving us the opportunity to submit this Letter of Intent.

**Commercial Funding, Inc.**

By: _____
Name: Steve Sala
Title: Senior Vice President and General Manager


Accepted and Agreed By:

**Pyramid Quality Solutions & Innovations, Inc.**

By: _____
Name: _____
Title: _____

170 S. Main Street
Suite 700
Salt Lake City, Utah 84101
866.222.2396 • 801.575.6500 • Fax: 801.575.6507 • Website: www.commercialfund.com

2

# EXHIBIT B



# Post-Petition Purchase and Sale Agreement

This Post-Petition Purchase and Sale Agreement ("Agreement") is made and entered into as of this _____ day of _____, 2018, by and between Commercial Funding Inc., a Delaware corporation located at 170 South Main Street, Suite 700, Salt Lake City, Utah 84101 ("CFI") and **Pyramid Quality Solutions and Innovations Inc**., a Michigan Corporation located at 2075 W. Big Beaver Road, Suite 415, Troy, MI 48084 ("Debtor" or "Seller" and, together with CFI, the "Parties") which on _____ (the "Petition Date") commences a voluntary case (the "Chapter 11 Case") under Chapter 11 of Title 11 of the U.S. Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the _____ District of _____ (the "Bankruptcy Court"), and the Debtor has continued to operate its businesses and manage its properties as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

1.  <u>Definitions</u>.  Terms defined in the singular shall have the same meaning when used in the plural and vice versa.  Terms defined in the UCC shall have the meanings set forth in the UCC, except as otherwise defined herein.  As used herein, the term:

"Acceptable Account" means an Account of Seller conforming to the representations, warranties, and requirements in this Agreement and determined to be acceptable for purchase under this Agreement in the sole and absolute discretion of CFI.

"Account" shall have the meaning set forth in the UCC.

"Account Debtor" shall have the meaning set forth in the UCC.

"Account Due Date" means Ninety (90) days from the date of the invoice evidencing the Account.

"Advance" means a payment of any portion of the Purchase Price to or on behalf of Seller.

"Advance Rate" means Eighty Five percent (85%), or such other percent as may be determined from time to time by CFI in its sole discretion.  CFI may set different Advance Rates for different Account Debtors, in its sole discretion.

"Affiliates"  means with respect to CFI, Commercial Credit, Inc. and any entity controlled by Commercial Credit, Inc., including Commercial Credit Group Inc.

"Authorized Overadvance" means an Overadvance which CFI elects to treat as an Authorized Overadvance.

"Authorized Overadvance Rate" means a daily rate as set forth from time to time by CFI.

"Avoidance Claim" means the assertion, complaint, judgment or otherwise against CFI, that any payment CFI received with respect to any Account, whether the amount related thereto was paid by the Account Debtor, Seller, on behalf of Seller or for its benefit, or any lien granted to CFI is avoidable (or recoverable from CFI) under the United States Bankruptcy Code, any other debtor relief statute, including, but not limited to, preference claims, fraudulent transfer claims, or through receivership, assignment for the benefit of creditors or any equivalent recovery law, rule or regulation which relates to the adjustment of debtor and creditor relations.

"Banking Business Day" means any day not a Saturday, Sunday, or legal holiday in the State of Utah, or day on which national banks in the State of Utah are authorized to close.

"Budget" shall have the same definition as set forth in the DIP Order.

"Chargeback Account" means an outstanding Purchased Account (i) which is past the Account Due Date or (ii) as to which CFI determines at any time that all or a portion of such Account is no longer an Acceptable Account.

"Collected Payments" means collections and payments received by CFI on Accounts of Seller, less all Fees and Charges, amounts due and payable to CFI by Seller, deductions and setoffs.  Credits for Collected Payments shall be provisional and subject to final payment and collection of the deposited item.  For purposes of this Agreement, Collected Payments will not be deemed collected by CFI until five (5) business days after the check or other payment therefore is received by CFI.

"Contract Term" means a period of one- (1) year commencing on date of the initial Advance of Accounts and ending on the day preceding the first anniversary of such date and thereafter each successive one year period commencing upon the anniversary date of the initial  Advance of Accounts unless this Agreement is terminated pursuant to the terms contained herein.

"Default Rate" means one hundred sixty seven thousands of one percent (0.167%) per diem against all outstanding advances commencing upon the Event of any Default.

"DIP Collateral" shall have the same definition as set forth in the DIP Order.

"DIP Liens" shall have the same definition as set forth in the DIP Order.

"DIP Order" shall mean, collectively, the Interim Order and the Final Order.  To the extent of any conflict between the terms of this Agreement and the DIP Order, the DIP Order shall control.

"Documents" shall have the same definition as set forth in the DIP Order.

"Equipment" shall have the meaning set forth in the UCC.

"Event of Default" shall have the meaning set forth in Section 266, <u>Default and Remedies</u>.

"Face Amount" means the total amount due specified on an Account's invoice, at the time of purchase, less any Fees and Charges.

"Fees and Charges" means the fees and charges set forth in Section 5, Contractual Fees and Charges, and the Supplemental Fee.

"Final Order" shall mean an order of the Bankruptcy Court approving the terms and conditions of this Agreement substantially in the form of and containing the provisions present in the Interim Order (including, without limitation, the granting of the Superpriority Claim and DIP Liens, the automatic perfection of the DIP Liens, and the payment of all fees referred to herein) and additional provisions (including, without limitation, prohibiting any claims against the DIP Collateral pursuant to Sections 506(c), 510, 549, or 550 of the Bankruptcy Code, waiver of any "equities of the case" claims under Section 552(b) of the Bankruptcy Code, granting of a Superpriority Claim over claims that may exist or arise under Section 507(b) of the Bankruptcy Code, approving CFI's right to credit bid the Obligations and waiving any right of CFI to marshal with respect to the DIP Collateral). The Final Order shall be in form and substance satisfactory to CFI in its sole and absolute discretion.

"Interim Order" shall mean the *Interim Order (1) Authorizing Debtor to Sell Accounts Receivable Under a Postpetition Accounts Receivable Factor Program with CFI Capital, Inc.; (II) Granting Liens and Providing Super-Priority Administrative Expense Status; (III) Granting Adequate Protection; and (IV) Scheduling a Final Hearing* entered by the Bankruptcy Court in the Bankruptcy Case on May 1, 2018.

"Inventory" shall have the meaning set forth in the UCC.

"Invalid Invoice Fee" means ten percent (10%) of the Face Amount of any purchased Account as liquidated damages for failure to comply with Section 14, Acceptable Account, of this Agreement.

"Maximum Advances" means the maximum aggregate amount of Outstanding Advances, which amount shall not exceed Two Hundred Thousand  dollars ($200,000.00-), or such other amount as may be determined from time to time by CFI in its sole discretion.

"Minimum Fee Amount" means an amount equal to three quarters of one percent (.75%) of the Maximum Advances for each Fee Period of the Contract Term. The Fee Period shall be monthly.

"Missing Notation Fee" means ten percent (10%) of the amount of any purchased Account as liquidated damages for failure to comply with Section 13(a), Collection Procedures, of this Agreement.

"Notation" means all invoices for any Account Debtor shall have the following on each invoice: "This Account has been sold and assigned to Commercial Funding Inc.,170 South Main Street, Suite 700, Salt Lake City, UT 84101 and all Payments should be directed to, P.O. Box 207527, Dallas, TX 75320-7527," or such other notation as may be required by CFI.

"Obligations" means and includes each and all of the following: the obligation to pay and perform when due all debts and all obligations, liabilities, covenants, agreements, guaranties, warranties and representations of Seller to CFI or any Affiliate of CFI, of any and every kind and nature (including all those set forth in the DIP Order), whether heretofore, now or hereafter owing, arising, due or payable from Seller to CFI or any Affiliate of CFI; howsoever created, incurred, acquired, arising or evidenced; whether primary, secondary, direct, absolute, contingent, fixed, secured, unsecured, or otherwise; whether as principal or guarantor; liquidated or unliquidated; certain or uncertain; determined or undetermined; due or to become due; as a result of present or future advances or otherwise; joint or individual; pursuant to or caused by Seller's breach of this Agreement, or of any other agreement between Seller and CFI or any Affiliate of CFI or any other present or future agreement or instrument, or created by operation of law or otherwise; evidenced by a written instrument or oral; created directly between Seller and CFI or any Affiliate of CFI or owed by Seller to a third party and acquired by CFI or any Affiliate of CFI from such third party; monetary or nonmonetary together with (a) any and all loans, advances, payments, extensions of credit, endorsements, benefits and financial accommodations, previously, now or hereafter made, granted or extended by  CFI or any Affiliate of CFI to or on account of Seller  or which CFI or any Affiliate of CFI has or will become obligated to make, grant or extend to or for the account of Seller; and (b) any and all interest, commissions, rent, obligations, liabilities, indebtedness, charges, late charges, prepayment premium, attorneys' fees and costs and expenses hereto and/or hereafter chargeable against Seller by CFI or any Affiliate of CFI or owing by Seller to CFI or any Affiliate of CFI or upon which Seller may be and/or has become liable as endorser or guarantor; and (c) all obligations and/or indebtedness of any and every kind of Seller to CFI or any Affiliate of CFI whether direct or indirect, whether contingent or absolute, whether matured or un-matured and whether now or in the future arising, existing, incurred, contracted or owing to CFI or any Affiliate of CFI or acquired by CFI or any Affiliate of CFI by one or more assignments, transfers or otherwise, including but not limited to amounts due upon any notes or other obligations, given to or received by CFI or any Affiliate of CFI directly from Seller or by way of assignment from any one or more third parties and whether or not presently contemplated by the parties; and (d) any and all renewals, amendments, rewrites, increases, modifications or extensions of any of the foregoing.

"Online Reporting Service" means the system set up on CFI's website where Seller provides CFI with the pertinent data necessary for CFI to purchase Accounts under this Agreement and to otherwise administer this Agreement.

"Online Statement of Account" shall have that meaning in Section 9, Application of Payments; Online Statement of Account.

"Origination Fee" means zero percent (0%) of the Maximum Advances.

"Outstanding Advances" means Advances for which CFI has not received Collected Payments in full and includes Advances against Chargeback Accounts for which Collected Payments in full have not been received and the full re-purchase price has not been paid.

"Overadvance" means: (a) the amount by which the Outstanding Advances exceed the Maximum Advances; (b) the amount by which the Outstanding Advances exceed Purchased Accounts which are not Chargeback Accounts multiplied by the Advance Rate; and (c) the amount exceeding the Reserve Account as applied according to Section 6, Re-Purchase Obligation and Chargeback Accounts.

"Payment Conversion Fee" means liquidated damages: (i) if Seller fails to tender to CFI any payment received by Seller on a Purchased Account within three (3) Banking Business Days, as required in this Agreement, but nevertheless Seller voluntarily tenders the payment to CFI thereafter, or if Seller deposits or negotiates the received payment, the greater of fifteen percent (15%) of the Face

Amount of such Purchased Account or one hundred dollars ($100.00); or (ii) if Seller fails to tender to CFI any payment received by Seller on a Purchased Account within three (3) Banking Business Days, as required in this Agreement, and CFI discovers on its own that Seller received the payment and has failed to voluntarily tender such payment to CFI, the greater of 40 percent (forty%) of the Face Amount of such Purchased Account or three hundred fifty dollars ($350.00).

"Prime Rate" means the prime rate as announced by JPMorgan Chase Bank, N.A., or such other bank CFI chooses in its sole discretion if JPMorgan Chase Bank, N.A. no longer announces a Prime Rate, adjusted from time to time as of the date of any change in the Prime Rate.

"Purchase Price" of an Account means the Face Amount of an Account, less all interest on Advances against the Purchase Price, and less the Fees and Charges.

"Purchased Account" means all of Seller's right, title and interest in an Account that has been sold, transferred, conveyed, assigned and delivered by Seller to CFI as absolute owner, pursuant to Section 2, Purchase of Accounts.

"Required Reserve Amount" means the cumulative total of the respective Reserve Percentage for each Purchased Account multiplied by the unpaid balance of each such Purchased Account.

"Reserve Account" means the bookkeeping account(s) on the books of CFI, as deemed necessary or appropriate by CFI, to ensure Seller's performance with the provisions hereof.

"Reserve Percentage" meansfifteen percent (15%), or such other percentage as CFI shall deem appropriate, in its sole discretion.

"Reserve Shortfall" means the amount by which the Reserve Account is less than the Required Reserve Amount.

"Serviced Account" means all Accounts of Seller which are not Purchased Accounts, except as designated otherwise in writing by CFI.

"Servicing Fee" shall have the meaning set forth in Section 5, Contractual Fees and Charges.

"Settlement Date" means dates set by CFI, which dates shall be at least weekly.

"Statutory Committee" shall have the same definition as set forth in the DIP Order.

"Superpriority Claim" shall have the same definition as set forth in the DIP Order.

"Supplemental Fee" means, for any Fee Period, a shortfall fee equal to the excess, if any, of the Minimum Fee Amount for such Fee Period over the Servicing Fee for such Fee Period, prorated for the first and last months of this Agreement.

"UCC" means the Uniform Commercial Code, as adopted now or in the future in the State of Utah.

    2.    Purchase of Accounts.

Seller shall submit Accounts for purchase by submitting a schedule of Accounts and Bill of Sale, copies of the invoices listed on the Schedule of Accounts and Bill of Sale, and supporting documentation for such invoices as requested by CFI.

CFI may purchase from Seller such Acceptable Accounts as CFI elects and shall notify Seller which Accounts are purchased by providing reports to Seller.  All purchases shall be subject to the terms and conditions of this Agreement. CFI is under no obligation to purchase any Account from Seller and all purchases under this Agreement shall be within CFI's sole discretion.

Each purchase by CFI shall be a true purchase with transfer of all legal and equitable title and shall not be deemed to be a loan. The Accounts shall be the sole and exclusive property of CFI, and Seller shall thereafter have no right, title or interest in or to Purchased Accounts or payments thereof.

    3.    Purchase Price of Accounts.

The Purchase Price for an Account shall be payable as follows:  (i) an amount equal to the Face Amount of the Account multiplied by the Advance Rate less Reserves and less sales taxes charged to or payable by the Account Debtor relating to amounts due for an Account shall be payable as an Advance upon purchase of the Account by CFI, which Advance shall be made in CFI sole discretion; and (ii) the balance of the Purchase Price shall be payable after receipt of Collected Payments in full for the Purchased Account, such balance to be paid on the next Settlement Date; provided, however, that, notwithstanding anything to the contrary in this Agreement, CFI shall not be obligated to make any Advance if, after making the Advance, the amount of all Outstanding Advances will exceed the Maximum Advances or there are not sufficient Reserves for the Account in question.

    4.    Serviced Accounts.

No Advances shall be made against Serviced Accounts.  Except as otherwise agreed in writing by CFI, all Serviced Accounts shall be subject to the collection procedures set forth in Section 13, Collection Procedures.

Collected Payments on Serviced Accounts shall be paid to Seller on the next Settlement Date.

    5.    Contractual Fees and Charges.

Seller shall pay CFI the following fees and charges, which fees and charges may be deducted from Advances, Collected Payments or the Reserve Account. Seller shall pay CFI all accrued fees and charges upon demand.

        a.    The Origination Fee and the Supplemental Fee;

        b.    A servicing fee (the "Servicing Fee") which is the greater of: (i) one and nine tenths of one percent (1.90%) of the Face Amount of each invoice evidencing a Purchased Account for the first thirty (30) days, or portion thereof, from the date of the purchase of the Account, due and payable upon the purchase date of each Account, plus (ii) three quarters of one percent (0.75%) of the Face Amount of each invoice for each ten (10) day increment or portion thereof due and payable upon, the earlier of (a) receipt of Collected Payments paying the Account or (b) the date the Account becomes a Chargeback Account; or (ii) ten dollars ($10.00) for each such invoice (the "Servicing Fee"). Client shall pay the Serving Fee for all Purchased Accounts and Serviced Accounts.. For the avoidance of doubt, Seller shall pay the Servicing Fee for all Purchased Accounts and Serviced Accounts.

        c.    Upon the occurrence of an Event of Default, the Default Rate shall be charged on all Outstanding Advances, both before and after judgment, until receipt of Collected Payments.     .

The Servicing Fee, and other fees and charges are for administration of the Accounts, collection of the Accounts, and administration of this Agreement. Fees are not intended to be and shall not be construed to be interest. The fees listed are not inclusive of all fees which may be assessed pursuant to this Agreement or at law.

Seller shall pay all other fees and charges allowable under this Agreement immediately upon assessment, including but not limited to the Invalid Invoice Fee, Missing Notation Fee, and Payment Conversion Fee.

6.     Re-Purchase Obligation and Chargeback Accounts.

In the event that a Purchased Account becomes a Chargeback Account, CFI shall charge the Chargeback Account to the Reserve Account. In the event that the Reserve Account is not sufficient to cover the Chargeback Account, Seller shall immediately pay to CFI an amount sufficient to re-purchase the Chargeback Account by paying CFI the amount of the Outstanding Advance against the Chargeback Account, plus the Daily Funds Rate, the Servicing Fee, and all other Fees and Charges thereon. Effective on the date of chargeback, the Daily Funds Rate shall be replaced by the Default Rate on the unpaid Chargeback Account. A Chargeback Account shall not be deemed reassigned to Seller until the amount due from Seller to CFI for such Chargeback Account is actually paid to and received by CFI in full.

7.     Overadvances and Authorized Overadvances.

If at any time an Overadvance exists, Seller shall immediately pay to CFI an amount equal to the Overadvance, unless CFI elects, in its sole discretion, to treat the Overadvance as an Authorized Overadvance. If the Overadvance is not immediately paid, Fees and Charges shall accrue on the Overadvance, both before and after judgment, from the date of creation of the Overadvance until paid, at the Default Rate, which shall be immediately due and payable. If CFI elects to treat the Overadvance as an Authorized Overadvance, the Authorized Overadvance and Fees and Charges thereon shall be due and payable upon demand or as otherwise agreed by CFI. Fees and Charges shall accrue on the Authorized Overadvance, both before and after judgment, from the date of creation of the Authorized Overadvance until paid, at the Authorized Overadvance Rate.

8.     Reserve Account.

CFI may apply a portion of any Purchase Price to the Reserve Account in the amount of the Reserve Shortfall. Seller shall pay to CFI on demand the amount of any Reserve Shortfall.

CFI may, in its sole discretion, pay to Seller any amount by which collected funds in the Reserve Account are greater than the Required Reserve Amount; provided that no Event of Default exists hereunder, and provided further that CFI, in its sole discretion and acting in good faith, has no concerns about Seller's ability to perform its Obligations hereunder.

CFI may charge the Reserve Account with any obligation arising hereunder, including any amounts due from Seller to CFI or any Affiliate of CFI hereunder. CFI may pay any amounts due Seller hereunder by a credit to the Reserve Account. Upon the Termination Date (defined below) and/or voluntary termination as set forth in Section 20, Renewal of Contract Term, and after payment of all amounts owing to CFI or any Affiliate of CFI by Seller, any balance of the Reserve Account shall be paid to Seller, provided that if CFI or any Affiliate of CFI has reasonable grounds to believe that any collections or other payments received by CFI or any Affiliate of CFI may be dishonored, voided, or preferential, or claims may be made against CFI or any Affiliate of CFI for which Seller would be liable, CFI may continue to hold the Reserve Account so long as such matters are outstanding and unresolved.

CFI shall have no obligation to segregate, not commingle, or otherwise account for the use of the Reserve Account. Seller shall not be entitled to any interest on the Reserve Account. The Reserve Account shall be a conditional obligation owed to Seller by CFI, payable in accordance with the terms and conditions of this Agreement.

9.     Application of Payments and Collections; Online Statement of Account.

Checks, instruments, wire transfers and all other non-cash payments delivered to CFI in payment or on account for the Obligations, constitute conditional payment only until such items are actually paid in cash to CFI or the funds clear, for the purpose of computing Fees and Charges earned by CFI under this Agreement. All payments made by or on behalf of, and all credits due to Seller, may be applied and reapplied in whole or in part to any of the Obligations to such extent and in such manner as CFI shall determine in its sole discretion. Any payments received on any Account not factored by CFI shall be placed in the Reserve Account.

CFI may post all of Seller's account activity on CFI's website, which shall constitute Seller's Online Statement of Account. Unless the Parties otherwise agree in writing, CFI shall not send Seller any hard copies of any activities which constitute Seller's Online Statement of Account. Provided that there is no Event of Default, CFI shall provide Seller with continuous access to view the Online Statement of Account. Seller shall be solely responsible for checking its Online Statement of Account. If Seller disputes any entry on the Online Statement of Account, or a written statement of account, it shall, within thirty (30) days after the first posting of the event, or sending the written statement of account, send to CFI a written exception to such event. Unless CFI receives a timely written exception to the activity posted to the Online Statement of Account, or contained in any statement of account, within thirty (30) days after it is first posted, or mailed, the Online Statement of Account, or statement of account, shall become an account stated and be deemed accepted by Seller and shall be conclusive and binding upon Seller.

10.     Setoff and Deduction by CFI.

As to all amounts owing to CFI or any Affiliate of CFI by Seller, CFI or any Affiliate of CFI may: (i) deduct such amount from Collected Payments received on Accounts; (ii) setoff and deduct such amount against Advances or any amount owing by CFI or any Affiliate of CFI to Seller; (iii) demand payment from Seller whereupon Seller shall promptly pay such amount to CFI or any Affiliate of CFI; or (iv) exercise any combination of the alternatives set forth in this Section or available under this Agreement, at law, or in equity.

11.     Excess Fees.

It is the intent of the Parties to comply with any usury law applicable to this Agreement and to all amounts owing pursuant to this Agreement and it is understood and agreed that in no event and upon no contingency shall Seller or any guarantor be required to pay interest in excess of the rate allowed by any laws of any state which are determined to be applicable and governing.

Any interest rate, late charge, fee or other charge ("Charge") provided for in any way hereunder or under any document, note or instrument given in connection with any of the Obligations shall not in any event or contingency exceed any maximum permitted by applicable law and any such Charge shall be deemed hereby amended to such maximum amount. Any sums collected with respect to any Charge in excess of any maximum

    interest (including simple interest thereon at the highest permissible rate which is applicable and governing) shall be promptly applied to the amounts owing by Seller hereunder and then to Outstanding Advances. To the extent such excess interest is greater than such amounts, CFI shall promptly remit such overage to Seller.

    12.    <u>Reports and Audits</u>.

    Upon request, which request may be made as frequently as determined by CFI, Seller will promptly submit to CFI a current Account Debtor list, which shall include the name, address, contact person name, phone number, email, and fax number for each active Account Debtor and such other records and reports concerning its Accounts, Inventory, the DIP Collateral, sales of goods or services, and operations as may be requested by CFI.

    Without limiting any other provision of this Agreement regarding payment of fees and expenses, Seller shall, at any reasonable time and from time to time, permit CFI or any representative of CFI to conduct field audits, examine, audit, and make copies of and extracts from the records and books of, and visit and inspect the DIP Collateral, properties and assets of Seller, and to discuss the affairs, finances, and Accounts of Seller with any of Seller's officers, directors, and partners and with Seller's independent accountants.

    13.    <u>Collection Procedures</u>. The following collection procedures shall apply to this Agreement:

    a.    Each invoice shall be stamped or printed with a notice, in a form acceptable to CFI, stating that the Purchased Account has been sold and assigned to CFI and is payable to CFI and providing payment instructions. In the event that Seller sends to an Account Debtor any invoice which does not contain the acceptable notation, it will be impracticable or extremely difficult to determine the resulting damages suffered by CFI. It is therefore agreed that Seller shall immediately pay to CFI as liquidated damages the Missing Notation Fee. Except as agreed otherwise in writing by CFI, CFI shall have the exclusive right to collect and to receive all payments on all Purchased Accounts and Serviced Accounts whether purchased by CFI or otherwise and receive payments thereon. Seller shall not otherwise bill for, submit any invoice, or otherwise attempt to collect any Purchased Account or Serviced Account, except as authorized in writing by CFI. CFI is authorized to notify Account Debtors of the assignment and purchase of Seller's Accounts and to direct Account Debtors to make all payments on Purchased Accounts and Serviced Accounts directly to CFI.

    b.    Seller authorizes CFI to contact Account Debtors concerning verification and payment of Accounts.

    c.    All collections of Purchased Accounts and Serviced Accounts shall be handled by CFI. Collection of Accounts in a commercially reasonable manner does not require, and CFI is not obligated, to commence any legal action, including the sending of an attorney's demand letter, to collect any Account. Seller acknowledges and agrees that CFI is not a collection agency and will not provide debt collection services for Seller's Accounts. If any Purchased Account or Serviced Account is not timely paid, CFI may, but is not obligated to, engage a collection agency, attorney or other service provider to collect Purchased Accounts or Serviced Accounts. All commissions, fees and charges of any such collection agency, attorney or other service provider shall be paid by Seller and shall become part of the Obligations.

    d.    Seller shall promptly and completely respond to all requests from CFI for any information or records requested to assist in collection of Accounts. If Seller fails to respond to any request within a reasonable time frame, CFI may deem the Account to no longer be an Acceptable Account.

    e.    Upon inquiry from an Account Debtor or upon request of CFI, Seller shall notify the Account Debtor to make payment directly to CFI.

    f.    Any payments received by Seller on Purchased Accounts shall be held in trust by Seller for CFI. In the event an Account Debtor makes payment to Seller on any Purchased Account, Seller shall immediately notify CFI of the payment and deliver the payment to CFI. If payment is made by check or similar instrument, such instrument shall be immediately delivered to CFI in the form received without negotiation. The Parties agree that if any payment on account of a Purchased Account is not negotiated or tendered to CFI within three (3) Banking Business Days of receipt by Seller, it will be impracticable or extremely difficult to determine the resulting damages suffered by CFI. It is therefore agreed that in the event of such a breach by Seller, Seller shall immediately pay CFI the Payment Conversion Fee as liquidated damages for Seller's breach of the foregoing warranty.

    g.    Seller shall immediately notify CFI of any dispute concerning any Purchased Account or Serviced Account and of any bankruptcy filing, lien, garnishment or other legal action concerning any Purchased Account, Serviced Account or Account Debtor.

    h.    CFI may, but has no duty to, and Seller hereby authorizes CFI to, execute and file, on behalf of Seller or in CFI's name, mechanic's liens and all other notices and documents to create, perfect, preserve, foreclose and/or release any lien for work performed or materials provided to improve real property. Except as otherwise instructed by CFI, Seller is authorized to file any such mechanic's liens and other notices and documents in Seller's discretion.

    14.    <u>Acceptable Account</u>.

    An Acceptable Account must meet, at least, all of the following requirements, conditions, representations and warranties, unless waived in writing by CFI.

    a.    Seller has sole and unconditional good title to the Account and any goods sold and/or labor rendered to create the Account are free from any other security interest, assignment, lien or other encumbrance of any type.

    b.    The Account is a bona fide, valid, genuine, and enforceable obligation of the Account Debtor for the amount identified on the records of Seller and there have not been, and there will not be, any payments, deductions (including over, short, and damage claims), credits, discounts, payment terms, or other modifications or reductions in the amount owing on such Account except as reported to CFI in writing prior to making an Advance based on the Account.

c. The Account must be submitted to CFI within seven (7) days of the date the goods are sold or the labor rendered giving rise to the Account are completed, except as otherwise agreed by CFI.

d. There are no defenses or setoffs to payment of the Account which can be asserted by way of defense or counterclaim against Seller or CFI.

e. The Account is not a contra-account and is not for sale by consignment.

f. The Account will be timely paid in full by the Account Debtor.

g. There have been no extensions, modifications, or other agreements relating to payment of such Account except as reported to CFI in writing prior to making an Advance.

h. Any labor rendered or goods sold which give rise to the Account have been completed and delivered and have been rendered or sold in compliance with all applicable laws, ordinances, rules and regulations and were performed or sold in the ordinary course of Seller's business.

i. The Account is not owing by an employee, officer, or director of Seller.

j. The Account is not owing by a parent, subsidiary, sister company, or other company related to or an affiliate of Seller.

k. The Account Debtor is located or authorized to do business within the United States or the Account has been insured under a policy of credit insurance from an insurer and upon terms acceptable to CFI.

l. No proceeding has been commenced or petition filed under any bankruptcy or insolvency law by or against the Account Debtor; no receiver, trustee or custodian has been appointed for any part of the property of the Account Debtor; and no property of the Account Debtor has been assigned for the benefit of creditors.

m. Neither the Account, nor any invoice, credit application, bill, billing memorandum, correspondence, or any other document relating to an Account, contracts for or charges interest or any other charge in excess of the maximum non-usurious rate allowed pursuant to applicable law.

n. The Account is not past the Account Due Date, except as otherwise agreed in writing by CFI.

o. If the total of the outstanding Purchased Accounts owing by any single Account Debtor equals fifty percent (50%) or more of the total outstanding Purchased Accounts owing by all Account Debtors, the portion of the Purchased Accounts owing by that single Account Debtor in excess of this limit shall not be Acceptable Accounts.

p. If twenty-five percent (25%) or more of the outstanding Accounts owing by an Account Debtor are past the Account Due Date, none of the Accounts owing by that Account Debtor shall be Acceptable Accounts.

q. The Account has not been deemed by CFI, in its sole discretion, to be unacceptable. The Parties agree that if Seller breaches the warranties in Section 14(b),14(e), 14(g), 14(h), 14(i) or 14(j) it will be impracticable or extremely difficult to determine the resulting damages suffered by CFI. It is, therefore, agreed that Seller shall immediately pay to CFI as liquidated damages the Invalid Invoice Fee for each purchased Account which violates the warranties contained in Section 14(b), 14(e), 14(g), 14f(h), 14(i) or 14(j).

15. <u>Security.</u> In order to secure the payment of all Obligations of Seller to CFI, whether presently existing or hereafter arising under this Agreement, Seller grants to CFI the DIP Liens on the DIP Collateral as more fully described in the DIP Order. Notwithstanding the grant of security interests in favor of CFI as provided this Agreement, CFI shall be the absolute owner of all Purchased Accounts, free of any claims and interests.

16. <u>Additional conditions.</u> The effectiveness of this Agreement is conditioned on the following:

a. A Final Order shall have been entered by the Bankruptcy Court on or before the date that is 30 days after the entry of the Interim Order approving and authorizing Seller's entry into this Agreement, in form and substance acceptable to CFI in its sole and absolute discretion, which Final Order shall be in full force and effect and shall not have been vacated, reversed, modified, amended or stayed in any respect without prior consent of CFI.

b. Seller shall maintain cash managements systems reasonably acceptable to CFI and in accordance with the DIP Order.

c. Satisfactory resolution by the Seller, to be evidenced in writing to CFI, of all motions and/or disputes in the Bankruptcy Case regarding any collateral of the Seller (including, but not limited to, the DIP Collateral), including motions seeking relief from the automatic stay, objections to the use of cash collateral and all matters involving Centennial Bank.

d. CFI shall have received the Budget, which shall be in form and substance acceptable to CFI, and such other information (financial or otherwise) as CFI shall have reasonably requested.

e. Seller shall be in compliance with the Interim Order.

17. <u>Additional Representations, Warranties and Covenants of Seller.</u>

a. Seller is a Corporation organized and existing in good standing under the laws of the State of Michigan.

b. The complete and exact name of Seller is **Pyramid Quality Solutions and Innovations Inc**.. The organizational number of Seller assigned by its state of organization is 24158C. Except as noted in the following exceptions, during the five (5) years preceding the date of this Agreement: (a) Seller has not been known by or used any legal, fictitious or trade name; (b) Seller has not changed its name in any respect; (c) Seller has not been the surviving entity of a merger or consolidation; and (d) Seller has not acquired all or substantially all of the assets of any person or entity. Exceptions: _____.

CFI shall be the sole and exclusive purchaser of Seller's Accounts. Seller will not sell, factor or otherwise finance its Accounts and shall not grant any other security interest in its Accounts or Inventory.

c. The execution, delivery and performance by Seller of this Agreement have been duly authorized by all necessary action on the part of Seller, and are not inconsistent with any organizational documents of Seller, do not and will not contravene any provision of, or constitute a default under, any indenture, mortgage, contract or other instrument to which Seller is a party or by

which it is bound, and upon execution and delivery hereof, this Agreement will constitute a legal, valid and binding agreement and obligation of Seller, enforceable in accordance with its terms.

    d.  All financial statements of Seller, and of any guarantor of Seller's obligations under this Agreement, fully and fairly present the financial condition of Seller and any guarantor as of the date thereof and the results of operations for the period or periods covered thereby.  Since the date of such financial statements there has been no material adverse change in the financial condition of Seller or any guarantor.  Seller agrees to submit financial statements and copies of tax returns for Seller to CFI and Seller shall cause any guarantor to submit financial statements and copies of tax returns for such guarantor to CFI as may be requested by CFI, all such financial statements to fully and fairly present the financial condition of Seller or such guarantor, as the case may be, and to be in a form and from a firm acceptable to CFI.

    e.  Seller shall conduct its business in a lawful manner and in compliance with all applicable federal, state, and local laws, ordinances, rules, regulations, and orders and shall pay when due all lawfully imposed taxes upon its property, business and income.  No later than the fifth (5th) day of each month, Seller shall certify in writing to CFI, in a form acceptable to CFI, that all federal, state, and other taxes and assessments owing during the prior month have been paid in full.  Such certification shall be accompanied by proof of payment in a form acceptable to CFI.  If Seller fails to provide such certification, CFI may, at Seller's expense, conduct all necessary searches to determine that Seller has paid all taxes and assessments owing for the prior month.

    f.  This Agreement, the financial statements referred to herein, and all other statements furnished by Seller to CFI in connection herewith contain no untrue statement of a material fact and omit no material fact necessary to make the statements contained therein or herein not misleading.  Seller represents and warrants that it has not failed to disclose in writing to CFI any fact that materially and adversely affects, or is reasonably likely to materially and adversely affect, Seller's business, operations, properties, prospects, profits, condition (financial or otherwise), or ability to perform this Agreement.

    g.  No change of control of Seller or any guarantor shall occur except with prior written consent of CFI, which prior written consent shall not be unreasonably withheld.

    h.  Change of control means: (i) in the case of a corporation, any sale, assignment, or other transfer of more than twenty-five percent (25%) of the stock of such corporation, or the persons who are the directors of such corporation as of the date of this Agreement fail to constitute a majority of the Board of Directors of such corporation, or the president or any other executive officer of such corporation resigns, is terminated, or otherwise ceases to function in such position; (ii) in the case of a general or limited partnership, any sale, assignment, or other transfer of more than twenty-five percent (25%) of the general partnership interests of such partnership, any of the persons or entities who are a general partner of such partnership as of the date of this Agreement ceases to be a general partner of such partnership, the occurrence of any change of control in any general partner in such partnership, or any general manager or person holding a similar position in such partnership resigns, is terminated, or otherwise ceases to function in such position; or (iii) in the case of a limited liability company, any of the persons or entities who are members of such limited liability company as of the date of this Agreement ceases to be a member of such limited liability company, any managing member or manager of such limited liability company resigns, is terminated, or otherwise ceases to function in such position, or the occurrence of any change of control in any such member, managing member or manager of such limited liability company.

    i.  Seller shall use all funds received hereunder only as approved in the DIP Order.

    j.  Sales Taxes. Notwithstanding anything to the contrary herein provided, Seller shall be responsible for all sales taxes charged to customers, paid by customers or collected or paid to the Account traceable to Seller's sales of Inventory or rendition of services to its customers or Account Debtors.

  18. <u>Additional Representations, Warranties and Covenants Concerning DIP Collateral.</u>

    Seller represents, warrants, and covenants concerning the DIP Collateral as follows:

    a.  All Purchased Accounts are Acceptable Accounts.

    b.  Seller is the sole owner of the DIP Collateral.

    c.  The DIP Collateral is not subject to, and will be kept free and clear of, any security interest, lien, assignment, or other encumbrance of any nature whatsoever except for current taxes and assessments which are not delinquent, the security interests created by this Agreement, and assignments and security interests created and disclosed in writing to CFI and expressly consented to in writing by CFI prior to execution of this Agreement.

    d.  Seller hereby irrevocably appoints CFI as the true and lawful Attorney-in-Fact of Seller, coupled with an interest, with full power in Sellers name, place and stead to execute financing statements or other documents on Sellers behalf and to do any and all other acts on Sellers behalf necessary or helpful to perfect and continue perfection of Secured Party's security interest in the DIP Collateral pursuant to the Uniform Commercial Code or other applicable law including, but not limited to, completing, as needed, and correcting, any errors and omissions concerning descriptions, serial numbers, vehicle identifications numbers, or other descriptive information relating to the DIP Collateral and on any documents related hereto.  CFI is authorized to file, record, or otherwise utilize such documents as it deems necessary to perfect and/or enforce any security interest or lien granted hereunder.

    e.  The principal place of business of Seller is -----.  Seller agrees that it will provide CFI with not less than 30 days' prior written notice of any change of address in its principal place of business or of any change in its state of organization or of any merger or consolidation.

    f.  Seller shall keep the Equipment, if any, in good repair and be responsible for any loss or damage to the Equipment.  Seller shall pay when due all taxes, license fees and other charges on the Equipment.  Seller shall not sell, misuse, conceal, or in any way dispose of the Equipment or permit it to be used unlawfully or for hire or contrary to the provisions of any insurance coverage.  Risk of loss of the Equipment shall be on Seller at all times unless CFI takes possession of the Equipment.  Loss of or damage to the Equipment or any part thereof shall not release Seller from any of the obligations secured by the Equipment.

g.      Seller agrees to insure the DIP Collateral at Seller's expense, against loss, damage, theft, and such other risks as CFI may request to the full insurable value thereof with insurance companies and policies satisfactory to CFI. CFI shall be named as an additional insured and loss payee under such policies. All such policies shall provide for a minimum ten (10) days written cancellation notice to CFI. Upon request, policies or certificates attesting to such coverage shall be delivered to CFI. Seller hereby irrevocably appoints CFI as Sellers Attorney-in-Fact, coupled with an interest, to make claim for, settle, resolve, receive payment of, and execute and endorse all documents, checks or drafts received in payment for any loss or damage under any of said insurance policies and to execute any documents or statements related thereto. Insurance proceeds may be applied by CFI toward payment of any obligation secured by this Agreement, whether or not due, in such order of application as CFI may elect.

h.      So long as no Event of Default has occurred, Seller shall have the right to sell or otherwise dispose of the Inventory in the ordinary course of business. No other disposition of the Inventory may be made without the prior written consent of CFI.

i.      Seller shall immediately notify CFI in the event any Purchased Account is no longer an Acceptable Account.

19.      Assignment of Rights Concerning DIP Collateral.

Seller hereby assigns to CFI all of its interest in and rights to any Inventory which may be returned by Account Debtors, all rights as an unpaid vendor or lienor, all rights of stoppage in transit, repletion and reclamation relating thereto, including any leases or contracts related thereto all rights in and to all security therefor and guarantees thereof, all rights against third parties with respect thereto, and all rights under the UCC and any other law, statute, regulation or agreement.

20.      Renewal of Contract Term.

Provided (a) no Event of Default has occurred and is continuing and (b) the Termination Date has not then-occurred, then each Contract Term shall automatically renew for an additional Contract Term unless the Parties agree to voluntarily terminate this Agreement pursuant to this paragraph 20.

a.      Seller may voluntarily terminate this Agreement effective as of the end of a Contract Term by written notice to CFI delivered not more than ninety (90) days nor less than sixty (60) days prior to the expiration of the Contract Term then in effect. If Seller elects to voluntarily terminate this Agreement at any time other than the last day of a Contract Term, Seller shall pay CFI a termination fee equal to the greater of (i) the average monthly fees earned by CFI from Seller over the immediately prior three (3) calendar month period; or (ii) one percent (1.0%) of the Maximum Advances, for each of the remaining months and partial months in the then remaining term of this Agreement whichever is greater as determined by CFI (the "Termination Fee"). The Parties agree that the Termination Fee constitutes liquidated damages and is a reasonable estimate of the damages that CFI will incur as a result of Seller voluntarily terminating this Agreement. Upon voluntary termination, Seller shall be excused from the covenants herein providing that CFI shall be the sole and exclusive purchaser and source of financing for Seller's Accounts, but all other terms and provisions of this Agreement, including, without limitation, the security interests granted in favor of CFI, shall remain in full force and effect until all amounts owing to CFI hereunder have been finally paid in full. Upon voluntary termination, at the election of CFI, all outstanding Purchased Accounts will immediately be Chargeback Accounts and all amounts owing to CFI by Seller pursuant to this Agreement shall, without notice of such election, accelerate and become immediately due and payable in full.

b.      CFI may voluntarily terminate this Agreement effective as of the end of the Contract Term upon thirty (30) days written notice.

21.      Right to Perform for Seller.

CFI may, in its sole discretion, elect to discharge any security interest, lien or other encumbrance upon any Accounts, elect to pay any subcontractor, vendor, materialman, laborer, or other person to whom Seller is obligated, whether or not any mechanic's lien or other encumbrance has been asserted, and elect to pay any insurance charges payable by Seller or provide insurance as required herein if Seller fails to do so. Any such payments and all expenses incurred in connection therewith shall be immediately due and payable by Seller. CFI shall have no obligation to discharge any such security interest, lien or other encumbrance or pay such insurance charges or provide such insurance.

22.      Authorization to CFI.

Seller does hereby irrevocably authorize CFI, at Seller's expense, to exercise at any time the power to endorse the name of Seller upon any checks or other forms of payment on Purchased Accounts and to effect the deposit and collection thereof until all of the Obligations have been paid in full.

23.      Disclosure of Information.

Seller hereby consents to CFI disclosing to any financial institution or investor providing financing for CFI or participating in this financing, any and all information, knowledge, reports and records, including, without limitation, financial statements, concerning Seller or any guarantor.

24.      No Third Party Beneficiary.

This Agreement is made for the sole and exclusive benefit of CFI and Seller and is not intended to benefit any third party. No such third party may claim any right or benefit or seek to enforce any term or provision of this Agreement.

25.      Release, Waiver and Indemnification.

SELLER HEREBY RELEASES AND WAIVES ANY AND ALL CLAIMS (INCLUDING CONTRACT, TORT AND EQUITABLE CLAIMS) WHICH MAY BE ASSERTED AGAINST CFI, PRESENTLY EXISTING OR ARISING IN THE FUTURE, KNOWN OR UNKNOWN, ARISING FROM OR RELATING IN ANY MANNER TO THE PURCHASE, FINANCING, AND/OR COLLECTION OF ACCOUNTS PURSUANT TO THIS AGREEMENT, EXCLUDING ONLY BREACH OF CONTRACT BY CFI UNDER CIRCUMSTANCES THAT SUCH BREACH AMOUNTS TO GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

SELLER HEREBY AGREES TO INDEMNIFY CFI FOR ALL LIABILITIES AND DAMAGES (INCLUDING CONTRACT, TORT AND EQUITABLE CLAIMS AND AVOIDANCE CLAIMS) WHICH MAY BE AWARDED AGAINST CFI,

AND FOR ALL REASONABLE ATTORNEYS FEES, LEGAL EXPENSES AND OTHER EXPENSES INCURRED IN DEFENDING SUCH CLAIMS, ARISING FROM OR RELATING IN ANY MANNER TO THE PURCHASE, FINANCING, AND/OR COLLECTION OF ACCOUNTS (INCLUDING SALES TAX LIABILITIES RELATING TO THE ACCOUNTS) PURSUANT TO THIS AGREEMENT (INCLUDING ALL REASONABLE ATTORNEYS FEES, LEGAL EXPENSES AND OTHER EXPENSES INCURRED IN DEFENDING ANY SUCH CLAIMS BROUGHT BY SELLER OR ANY THIRD PARTY IF SELLER OR SUCH THIRD PARTY DOES NOT PREVAIL IN SUCH ACTIONS), EXCLUDING ONLY BREACH OF CONTRACT BY CFI UNDER CIRCUMSTANCES THAT SUCH BREACH AMOUNTS TO GROSS NEGLIGENCE OR WILLFUL MISCONDUCT. CFI SHALL HAVE SOLE AND COMPLETE CONTROL OF THE DEFENSE OF ANY SUCH CLAIMS AND IS HEREBY GIVEN AUTHORITY TO SETTLE OR OTHERWISE COMPROMISE ANY SUCH CLAIMS AS CFI IN GOOD FAITH DETERMINES SHALL BE IN ITS BEST INTERESTS. THIS SECTION SURVIVES TERMINATION OF THIS AGREEMENT.

26.    Default.

The occurrence of any of the following events without notice shall constitute a default under this Agreement or any agreement with CFI or any Affiliate of CFI and be termed an "Event of Default":

a.    The failure of Debtor to punctually and properly observe, keep or perform many covenant, agreement or condition of the Agreement required to be observed, kept or performed in all material respects; or required under any other agreement or contract that may be executed between (a) Debtor and CFI and/or (b) Debtor and an Affiliate of CFI, in each case subject to any applicable grace periods and cure rights.

b.    Any representation, warranty, or financial statement made by or on behalf of Seller, or any guarantor, proves to have been materially false or materially misleading when made or furnished.

c.    The failure of Debtor to, within ten (10) business days, deliver to CFI a remittance received by Debtor in payment of a Purchased Account.

d.    The failure of Debtor to pay any Obligations owed by Debtor to CFI any under any of CFI Documents when due and payable, in each case subject to any applicable grace periods and cure rights.

e.    The failure of Debtor to pay any obligations owed by Debtor to an Affiliate of CFI under any orders of the Bankruptcy Court when due and payable, in each case subject to any applicable grace periods and cure rights.

f.    A levy or notice of attachment, execution(s), tax lien(s) or assessment(s) or similar process is issued against the Accounts of Debtor or any other DIP Collateral, but in such case only to the extent such encumbrance primes CFI's security interest or otherwise adversely affects the rights and remedies of CFI.

g.    Debtor's allegation in any pleading or other writing, or the finding or conclusion by the Bankruptcy Court, that any agreement, loan or security document of CFI and/or an Affiliate of CFI is not valid, binding or enforceable.

h.    Entry of an Order dismissing the Bankruptcy Case or converting it to one under chapter 7 of the Bankruptcy Code.

i.    Appointment of a chapter 11 trustee or examiner with enlarged powers relating to the operation of the business of the Debtor.

j.    Any default under any cash collateral order.

k.    Any default under the DIP Order.

l.    The filing (with respect to all plans of reorganization filed by the Debtor) or confirmation (with respect to all plans filed by any person or entity other than the Debtor) of a plan of reorganization which contains a treatment of the Obligations under this Agreement in a manner inconsistent with that provided for in the Agreement, or, which, at a minimum, does not (a) provide for the indefeasible payment in full of the Obligations under the Agreement by a date or time any later than the "effective date" of such plan and (b) provide for the continuation of the DIP Liens and any other security interests created in favor of CFI with the priorities provided for in this Agreement and in the DIP Order until such plan effective date.

m.    The entry of an order authorizing the sale of all or substantially all of the assets of the Debtor which does not provide that the proceeds of sale, net of the costs approved by CFI, if any, of the DIP Collateral are paid to CFI.

n.    Entry of any order, without CFI's express written consent, reversing, amending, supplementing, staying or vacating the Interim Order or the Final Order.

o.    The failure of the Debtor to obtain a Final Order, in form and substance satisfactory to CFI, by May 31, 2018, unless otherwise agreed to by CFI.

27.    Remedies.

a.    Notwithstanding anything in this Agreement to the contrary, immediately upon the occurrence and during the continuation of an Event of Default, (i)  CFI may declare all Obligations owing under CFI Documents to be immediately due and payable, (ii) any further commitment of CFI to purchase Accounts or extend credit may be terminated, restricted, or reduced, (iii) after obtaining relief from the automatic stay, exercise its rights as a secured party and enforce the DIP Liens pursuant to applicable law, including, but not limited to, the right of CFI to establish contact with and instruct any and all Account debtors to remit payment(s) due or to become due arising from the sale of merchandise or rendering of services directly to CFI, and (iv) the Agreement shall be terminated as to any future liability or obligation of CFI, but without affecting any of the DIP Liens or the Obligations after first providing the Debtor, the United States Trustee and the Statutory Committee (if any) five (5) days written notice of the Event(s) of Default ("**Termination Date**").  On the Termination Date, the Obligations shall be due and payable, without notice or demand.  Any automatic stay otherwise applicable to CFI is hereby modified so that CFI shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the Agreement and this DIP Order and shall be permitted to satisfy the Obligations and Superpriority Claim, provided, however, that CFI shall not be entitled to exercise any remedies with respect to the DIP Collateral until five (5) business days after the Termination Date, during which time the Debtor shall be entitled to seek an emergency hearing with the Court for the sole

purpose of contesting whether an Event of Default has occurred. Unless the Court orders otherwise, the automatic stay shall automatically be terminated at the end without further notice or order, and CFI shall be permitted to exercise all remedies set forth herein, in the Agreement and as otherwise available at law against the DIP Collateral, without any further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the DIP Collateral or any other rights and remedies granted to CFI with respect thereto pursuant to the Agreement.

b. In addition to the above, upon the Termination Date, CFI shall have all other rights and remedies created by or arising from this Agreement and the following rights and remedies, in addition to all other rights and remedies existing at law, in equity, or by statute:

(i) CFI shall have all the rights and remedies available under the UCC and any other applicable law.

(ii) CFI shall have the right to enter upon any premises where the DIP Collateral or records pertaining thereto may be and take possession of the DIP Collateral and records relating thereto.

(iii) Upon request of CFI, Seller shall, at the expense of Seller, assemble the DIP Collateral and records relating thereto at a place designated by CFI and tender the DIP Collateral and records to CFI.

(iv) CFI may sell, lease or otherwise dispose of any or all of the DIP Collateral and, after deducting the reasonable costs and out-of-pocket expenses incurred by CFI, including, without limitation: (i) reasonable attorneys' fees and legal expenses; (ii) transportation and storage costs; (iii) costs of advertising sale of the DIP Collateral; (iv) sale commissions; (v) sales tax; (vi) costs for improving or repairing the DIP Collateral; and (vii) costs for preservation and protection of the DIP Collateral; and apply the remainder against, or to hold as a reserve against, the obligations secured by this Agreement. CFI may at any time and from time to time, without the consent of, or notice to Seller and any guarantors and without affecting or impairing the obligation of any Seller or any guarantor hereunder, do any of the following: (a) renew, increase, extend (including extensions beyond the original term of the respective instrument), modify (including covenants, conditions, changes in interest rates or fees, or amounts and/or timing of payments), release or discharge any Obligations or Accounts, (whether hereunder or under a separate instrument) or of any other party at any time directly or contingently liable for the payment or performance of any of said Obligations; (b) accept partial payments of said Obligations or Accounts; (c) accept new or additional documents, instruments or agreements relating to or in substitution of said Obligations or Accounts; (d) settle, release (by operation of law or otherwise), compound, compromise, collect or liquidate any of said Obligations or Accounts and the security thereunder in any manner or any other guarantee thereof;

(v) CFI may initiate electronic debit or credit entries through the Automated Clearing House ("ACH") system to any deposit or operating account maintained by Seller, wherever located.

c. In the event that, as a result of the disposition of any of the DIP Collateral, CFI directly or indirectly enters into a credit transaction with any third party, CFI shall have the option, exercisable at any time, in its sole discretion, of either reducing the Obligations by the principal amount of such credit transaction or deferring the reduction thereof until the actual receipt by CFI of good funds from such third party.

d. Upon an Event of Default, all of Seller's rights and access to any online internet services that CFI makes available to Seller shall be provisional pending Seller's cure rights, if any, of such Event of Default and CFI may elect to terminate Seller's online access as provided for herein. During such period of time, CFI may limit or terminate Seller's access to online services, Seller acknowledges that the information CFI makes available to Seller through online internet access, both before and after an Event of Default, constitutes and satisfies any duty to respond to a request for account or request regarding a statement of account that is referenced in the UCC.

e. Upon an Event of Default, the Parties acknowledge that it shall be presumed commercially reasonable and CFI shall have no duty to undertake to collect any Account, including those in which CFI receives information from an Account Debtor that a dispute exists. Furthermore, in the event CFI undertakes to collect or enforce an obligation of an Account Debtor or any other person obligated on the DIP Collateral and ascertains that the possibility of collection is outweighed by the likely costs and expenses that will be incurred, CFI may at any such time cease any further collection efforts and such action shall be considered commercially reasonable.

f. CFI's rights and remedies are cumulative and not exclusive of any other rights or remedies and shall be in addition to every other right, power and remedy herein specifically granted or existing at law, in equity, or by statute which CFI might otherwise have and may be exercised from time to time and as often and in such order as may be deemed expedient by CFI. No delay or omission by CFI in the exercise of any such right, power or remedy or in the pursuance of any remedy shall impair any such right, power or remedy or be construed to be a waiver of any Event of Default or to be an acquiescence therein. The employment of any particular remedy shall not prevent the concurrent or subsequent employment of any other appropriate remedy or remedies.

28. Payment of Expenses and Attorneys' Fees.

Seller shall pay all reasonable expenses of CFI relating to the negotiation, documentation, and administration of this Agreement, including, without limitation, title insurance, recording fees, filing fees, fees of collection services, reasonable attorneys' fees and legal expenses, returned check fees, photocopies, postage, audit and field examination fees and costs, inspection fees, wire transfer fees, and overnight delivery expenses, whether incurred in making Advances, in future amendments or modifications to this Agreement, or in ongoing administration of this financing.

Seller also agrees to pay all costs and expenses, including reasonable attorney fees and legal expenses, incurred by CFI in enforcing or exercising any remedies under this Agreement or any other rights and remedies.

Seller also agrees to pay all expenses, including reasonable attorney fees and legal expenses, incurred by CFI in the Bankruptcy Case and any other bankruptcy proceedings of any type involving any guarantor, this Agreement, the Purchased Accounts, the Serviced

Accounts, or the DIP Collateral, including, without limitation, fees and expenses incurred in modifying or lifting the automatic stay, determining adequate protection, use of cash collateral or relating to any plan of reorganization.

29.    Marshalling.  In no event shall CFI be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any DIP Collateral.

30.    Automated Clearing House Transactions.  In order to satisfy any of the Obligations and facilitate the purchase of Accounts, CFI is authorized by Seller to initiate electronic or debit entries through the Automated Clearing House or other wire transfer service as applicable.  This authorization is irrevocable.

31.    Limitation of Consequential Damages.  CFI and its shareholders, directors and officers, employees, representatives, agents, and attorneys, shall not be liable to Seller or any guarantor for consequential damages arising from or relating to any breach of contract, tort, or other wrong in connection with the negotiation, documentation, administration of this Agreement or collection of the Accounts.

32.    Force Majeure.  In the event CFI is unable to carry out its obligations under this Agreement due to reasons beyond its reasonable control, it is agreed that the obligations of CFI hereunder shall be suspended during the continuance of such inability, CFI shall not be liable for damages, and Seller shall not be entitled to any refund of amounts paid, provided that such cause shall be remedied as far as reasonably possible with all reasonable dispatch.

33.    No Lien Termination Without Release.  In recognition of CFI's right to have its attorneys' fees and other expenses incurred in connection with this Agreement secured by DIP Collateral, notwithstanding payment in full of all Obligations by Seller, CFI shall not be required to record any terminations or satisfactions of any of CFI's liens on the DIP Collateral unless and until Seller has executed and delivered to CFI a general release in a form suitable to CFI.  Seller understands that this section constitutes a waiver of its rights under Section 9-513 of the UCC.

34.    Joint and Several Liability.  Seller and any guarantors shall each be jointly and severally liable for all obligations and liabilities arising under this Agreement and the other agreements, documents, obligations, and transactions contemplated by this Agreement.

35.    Severability of Invalid Provisions.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

36.    Notices.  All notices which are expressly required to be in writing may be mailed, postage prepaid, addressed to the address stated at the beginning of this Agreement, or to such other address which is provided in accordance with this section.  Any notice so mailed shall be deemed given three (3) days after mailing.  Any notice otherwise delivered shall be deemed given when received by the addressee.  Any notice which is not expressly required to be given in writing may be given orally.

37.    Jury Waiver, Exclusive Jurisdiction of Utah Courts, Choice of Law.

SELLER HEREBY IRREVOCABLY WAIVES ALL RIGHTS TO TRIAL BY JURY IN ANY ACTION, PROCEEDING, CLAIM OR COUNTERCLAIM, WHETHER IN CONTRACT OR IN TORT, AT LAW OR IN EQUITY, ARISING OUT OF OR IN ANY WAY RELATED TO THIS AGREEMENT.

EXCEPT AS EXPRESSLY AGREED IN WRITING BY CFI, THE STATE AND FEDERAL COURTS LOCATED IN THE STATE OF UTAH, SHALL HAVE SOLE AND EXCLUSIVE JURISDICTION OF ANY AND ALL CLAIMS, DISPUTES, AND CONTROVERSIES ARISING UNDER OR RELATING TO THIS AGREEMENT.  NO LAWSUIT, PROCEEDING, ALTERNATIVE DISPUTE RESOLUTION, OR ANY OTHER ACTION RELATING TO OR ARISING UNDER THIS AGREEMENT MAY BE COMMENCED OR PROSECUTED IN ANY OTHER FORUM, EXCEPT AS EXPRESSLY AGREED IN WRITING BY CFI.

This Agreement shall be governed by and construed in accordance with the laws of the State of Utah and this Agreement shall be deemed to have been executed by the Parties in the State of Utah.  This Agreement shall not be deemed to have been entered into until accepted by CFI at its chief executive office in Salt Lake City, Utah, and shall be performed by CFI and the financing administered by CFI in Salt Lake City, Utah.  Seller acknowledges that by execution and delivery of this Agreement, Seller has transacted business in the State of Utah and Seller hereby voluntarily submits to, consents to, and waives any defense to the jurisdiction of courts located in the State of Utah as to all matters relating to or arising from this Agreement.

38.    Assignability.

This Agreement is not assignable or transferable by Seller and any such purported assignment or transfer is void.  This Agreement shall be deemed to be one of financial accommodation and not assumable by any debtor, trustee or debtor-in-possession in any bankruptcy proceeding without CFI's express written consent. This Agreement shall be binding upon the successors of Seller.  Seller acknowledges and agrees that CFI or its Affiliates may assign all or any portion of this Agreement, including, without limitation, assignment of the rights, benefits and remedies of CFI hereunder without any assignment of the duties, obligations or liabilities of CFI hereunder, and may sell participations in this financing.

39.    Counterpart Execution and Electronic Delivery.

This Agreement may be executed in several counterparts, without the requirement that each party sign each counterpart.  Each of such counterparts shall be an original, but all counterparts together shall constitute one and the same agreement.  Delivery of an executed copy of this Agreement by electronic means such as facsimile transmission (fax) or email shall constitute valid and binding delivery of the same as if an original had been delivered.  Any party delivering an executed copy of this Agreement by facsimile

transmission (fax) or email shall also promptly deliver an executed original, provided, however, that failure to deliver an executed original shall not affect the delivery by facsimile transmission (fax) or email as a valid binding delivery.

40. Electronic Signatures.

The Parties intend to conduct business contemplated by this Agreement by electronic means. Each document, which is the subject of this Agreement, that a party has transmitted electronically to the other shall be intended as and constitute an original and deemed to contain a valid signature of the party for all purposes acknowledging, consenting to, authorizing and approving the terms of this Agreement or any subject matter applicable thereto. In furtherance of the above, Seller hereby authorizes CFI to regard Seller's printed name or electronic approval for any document, agreement, assignment schedule or invoice as the equivalent of a manual signature by one of the Seller's authorized officers or agents. Seller's failure to promptly deliver to CFI any schedule, report, statement or other information required by this Agreement or any document related thereto shall not affect, diminish, modify or otherwise limit CFI's security interests in the DIP Collateral or rights and remedies under this Agreement. CFI may rely upon, and assume the authenticity of, any such approval and material applicable to such approval as the duly confirmed, authorized and approved signature of Seller by the person approving same which constitute an Authenticated Record for purposes of the UCC and shall satisfy the requirements of any applicable statute of frauds.

41. Online Conducting of Business.

CFI and Seller intend to conduct business contemplated by this Agreement through the internet and through CFI's Online Reporting Service. CFI is the sole and exclusive owner of the Online Reporting Service. Seller hereby accepts a non-exclusive, non-transferable right to access the Online Reporting Service, upon the terms and conditions contained herein.

42. Standards Regarding Conducting Business Online.

With respect to conducting business online, the following shall apply:

a. CFI shall have the right to terminate Seller's access to the Online Reporting Service upon the occurrence of an Event of Default or at any other time within CFI's discretion.

b. Seller shall not: (i) copy the Online Reporting Service nor otherwise reproduce the same other than for normal system operation backup; (ii) translate, adapt, vary, or modify the Online Reporting Service; or (iii) disassemble, decompile or reverse engineer the Online Reporting Service.

c. CFI shall not be liable to Seller for any loss or damage whatsoever or howsoever caused, whether caused by tort (including negligence), breach of contract, or otherwise arising directly or indirectly in connection with the use of the Online Reporting Service.

d. CFI expressly excludes liability for any indirect, special, incidental or consequential loss or damage whether caused by tort (including negligence), breach of contract or otherwise, which may arise in respect of the Online Reporting Service, its use, or in respect of equipment or property, or for loss of profit, business, revenue, goodwill or anticipated savings.

e. Seller acknowledges that any and all of the copyright, trademarks, trade names, patents and other intellectual property rights subsisting in or used in connection with the Online Reporting Service, including all documentation and manuals relating thereto, are, and shall remain, the sole property of the CFI. Seller shall not, during or at any time after the expiry or termination of its use of the Online Reporting Service, in any way question or dispute the ownership by CFI thereof.

f. To the extent permitted by applicable law, CFI excludes all warranties with respect to the Online Reporting Service, either express or implied, including, but not limited to, any implied warranties of satisfactory quality or fitness for any particular purpose.

g. Seller is solely responsible for virus scanning the Online Reporting Service, and CFI makes no representations or warranties regarding any virus associated with the Online Reporting Services.

h. All information, data, drawings, specifications, documentation, software listings, source or object code which CFI may have imparted and may from time to time impart to the Seller relating to the Online Reporting Service is proprietary and confidential. Seller hereby agrees that it shall use the same solely in accordance with the provisions of this Agreement and that it shall not, at any time during or after expiry or termination of this Agreement, disclose the same, whether directly or indirectly, to any third party.

43. Integrated Agreement, Amendment, Governing Law.

This Agreement replaces and supersedes any prior agreement between Seller and CFI. Seller hereby FOREVER, FINALLY, FULLY AND COMPLETELY RELEASES, RELIEVES, ACQUITS, REMISES, AND DISCHARGES CFI and its successors, predecessors and assigns, Affiliates, subsidiary companies, parent companies, past and present employees, agents, partners, representatives, attorneys, accountants, directors, shareholders, officers, and any other person acting in his or her individual or representative capacities (the "Releasees"), from any and all liens, losses, claims, debts, liabilities, demands, obligations, acts, agreements, litigation, reports, costs and expenses (including, without limitation, attorneys' fees), damages, injuries, suits, actions or causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, contingent or fixed, from the beginning of time until the date of this Agreement. This Agreement and the documents identified or contemplated herein constitute the entire agreement between CFI and Seller as to the subject matter hereof and may not be altered or amended except by written agreement signed by CFI and Seller. No provision hereof may be waived by CFI except upon written waiver executed by CFI.

44. Execution of Documents:

Seller shall sign all necessary documents to protect and preserve CFI's interests under this Agreement and is authorized to apply Sellers' scanned signature(s) to certain documents to include, but not be limited to, notices of assignment, IRS Form 8821, and documents necessary to make or receive payments from Seller via ACH. Sellers and Guarantor(s) scanned signatures affixed to this Agreement or any other related documents shall have the same force and effect under the law as original signatures. Seller hereby agrees to name CFI as a certificate holder on any liability and cargo policies of insurance that it may be required to carry and hereby appoints CFI as its claims manager under any cargo policy.

Dated: _____, 2018 .

**Commercial Funding Inc.**

By: _____

Name: _____

Title: _____


**Pyramid Quality Solutions and Innovations Inc**., **a Michigan Corporation**

By: _____

Name: _____

Title: _____

# EXHIBIT C

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### NORTHERN DIVISION

| | |
|---|---|
| In re:<br>Pyramid Quality Solutions & Innovations, Inc.<br>(01-0560606)<br>2075 W. Big Beaver Rd., Suite 415<br>Troy, MI 48084<br><div align="right">Debtor-in-Possession</div> | )<br>)<br>)<br>)<br>)<br>)<br>) | Case No: 18-52932<br><br>Chapter 11<br><br>Hon. Mark A. Randon |

**(PROPOSED) ORDER (1) AUTHORIZING DEBTOR TO SELL ACCOUNTS RECEIVABLE UNDER A POSTPETITION ACCOUNTS RECEIVABLE FACTOR PROGRAM WITH COMMERCAL FUNDING INC.; (II) GRANTING LIENS AND PROVIDING SUPER-PRIORITY ADMINISTRATIVE EXPENSE STATUS; AND (III) GRANTING ADEQUATE PROTECTION**

This matter having come before upon the motion (the "Motion") of Pyramid Quality Solutions and Innovations, Inc. ("Debtor") in the above-referenced Chapter 11 cases (collectively, the "Case"), pursuant to sections 105, 362, 363(c), 364(c), 364(d)(1), 364(e) and 507 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking, *inter alia,* entry of a Final Order (the "Final Order") authorizing the Debtor to:

i.      sell accounts receivable generated on or after the Petition Date (the "Accounts") under a post-petition accounts receivable factor program with Commercial Funding, Inc. (the "DIP Factor") in an amount not to presently exceed $_____ (the "DIP Factor Facility pursuant to sections 363 and 364 of the Bankruptcy Code by entering into the Post-Petition CFI Purchase and Sale Agreement and Term Sheet(the "DIP Factor Agreement") that sets forth the terms for a senior secured super priority debtor-in-possession factor facility, which DIP Factor Facility shall provide necessary liquidity and working capital for the Debtor's operations (the DIP Factor Agreement, the DIP Term Sheet and related documents and instruments, as may be amended, supplemented

22

or otherwise modified from time to time, the "<u>DIP Factor Documents</u>" and collectively with the CFI Loan Documents (as defined herein), the "<u>Documents</u>"), in the form annexed hereto as ***Exhibit 1*** between the Debtor and the DIP Factor[1];

ii.    grant super priority claims to and on behalf of and for the benefit of the DIP Factor in the DIP Collateral (as defined herein) in accordance with the DIP Factor Documents and the Final Order to secure any and all of the Debtor's obligations, indebtedness and liabilities under the DIP Factor Documents, including all fees and costs of professionals retained by the DIP Factor (the "<u>DIP Obligations</u>");

iii.    grant the DIP Factor automatically perfected security interests in and liens on all of the DIP Collateral (as defined herein), including, without limitation, all property constituting "Cash Collateral" (as defined in section 363(a) of the Bankruptcy Code, "<u>Cash Collateral</u>");

iv.    enter into the DIP Factor Agreement; and

v.    provide adequate protection to the DIP Factor, The Huntington National Bank (the "<u>Pre-Petition Factor</u>") and Commercial Funding, Inc. ("<u>CFI</u>").

The <u>Court</u> having considered the Motion and the exhibits attached thereto, including, without limitation, the <u>DIP Factor Agreement</u>, the evidenced submitted or adduced and the arguments of counsel made at the interim hearing, and due and sufficient notice of the <u>Motion</u> having been given in accordance with the Bankruptcy Rules and the Local Rules for the United States Bankruptcy Court (the "<u>Local Rules</u>"); and upon all of the pleadings filed with the Court

---

[1] *Capitalized terms used herein and not otherwise defined shall have the same meaning ascribed to such terms in the DIP Factor Agreement or, as applicable, the underlying motion.*

and all of the proceedings held before the Court; and after due deliberation and consideration and good and sufficient cause appearing therefor:

**BASED UPON THE RECORD ESTABLISHED AT THE HEARING BY THE DEBTOR, THE DEBTOR AND DIP FACTOR STIPULATE AND THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.   *Petition Date.* On September 21, 2018 (the "Petition Date"), Debtor filed a voluntary petition under Chapter 11 of the Bankruptcy Code in the Unites States Bankruptcy Court for the Eastern District of Michigan, commencing this Case (the "Court").

B.   *Debtor in Possession.* The Debtor is continuing in the management and operation of its businesses and properties as Debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in this Case.

C.   *Jurisdiction and Venue.* This Court has jurisdiction, pursuant to 28 U.S.C. §§ 157(b) and 1334, over these proceedings, and over the persons and property affected hereby. Consideration of the Motion constitutes a core proceeding under 28 U.S.C. § 157(b)(2). Venue for the Case and proceedings on the Motion is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

D.   *Statutory Committee.* The United States Trustee (the "U.S. Trustee") has not appointed an official committee of unsecured creditors in this Case pursuant to section 1102 of the Bankruptcy Code.

E.   Stipulations and Findings Regarding the Postpetition Financing.

(i)   Need for Postpetition Financing and Use of Cash Collateral. *The* Debtor's need to obtain credit pursuant to the DIP Factor Facility and use Cash Collateral is critical in order to enable the Debtor to continue operations, to minimize the disruption of the Debtor as a "going concern" and to administer and to preserve the value of its estate. The ability of the Debtor to finance its operations, maintain business relationships with its vendors, suppliers and customers, to pay its employees, and to otherwise finance its operations requires the availability of capital from the DIP Factor Facility. The Debtor does not have sufficient available sources of working capital and financing to operate its business or maintain its properties in the ordinary course of business without the DIP Factor

Facility.

(ii) No Credit Available on More Favorable Terms. *Given its current* financial condition, financing arrangements, and capital structure, the Debtor is unable to obtain financing from sources other than the DIP Factor on terms more favorable than the DIP Factor Facility. The Debtor is unable to obtain sufficient committed unsecured credit allowable under Bankruptcy Code section 503(b)(1) as an administrative expense. The Debtor is also unable to obtain sufficient committed secured credit allowable under Bankruptcy Code section 364(c) without granting the DIP Factor the (a) perfected security interests in and liens on (each as provided herein) on all of the Debtor's existing and after-acquired assets, (b) super priority claims, and (c) the other protections set forth in this Order.

(iii) *Use of Proceeds of the DIP Factor Facility.* The DIP Factor has agreed to purchase the Accounts and provide financial accommodations to fund the Debtor's required operations during the administration of the Debtor's Case at the DIP Factor's discretion. As a condition to the entry into the DIP Factor Facility, the DIP Factor has required, and the Debtor has agreed, that proceeds of the DIP Factor Facility shall be used, in each case in a manner consistent with the terms and conditions of the DIP Factor Documents, this Order and the Budget (defined below and as the same may be modified from time to time) solely for (1) working capital and other general corporate purposes, (2) permitted payment of costs of administration of the Case, (3) payment of fees and expenses due under the DIP Facility, and as approved by the Court.

(iv) *Sections 506(c) and 552(b).* DIP Factor is entitled to and shall receive (a) a waiver of any "equities of the case" claims under section 552(b) of the Bankruptcy Code, and (b) a waiver of the provisions of section 506(c) of the Bankruptcy Code

F. Good Faith of the DIP Factor.

(i) *Willingness to Provide Financing.* The DIP Factor has indicated a willingness to provide financing to the Debtor subject to: (a) the entry of this Order; (b) approval of the terms and conditions of the DIP Factor Facility and the DIP Factor Documents; and (c) entry of findings by this Court that such financing is essential to the Debtor's estate, that the DIP Factor is extending financial accommodations to the Debtor pursuant to the DIP Factor Documents in good faith, and that the DIP Factor's claims, super priority claims, security interests, liens, rights, and other protections granted pursuant to this Order and the DIP Factor Documents will have the protections provided in section 364(e) of the Bankruptcy Code and will not be affected by any subsequent reversal, modification, vacatur, amendment, re-argument or reconsideration of this Order or any other order.

25

(ii) *Business Judgment and Good Faith Pursuant to Section 364(e).* The terms and conditions of the DIP Factor Facility and the DIP Factor Documents, and the fees paid and to be paid thereunder, are fair, reasonable, and the best available to the Debtor under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration. The DIP Factor Facility was negotiated in good faith and at arm's length among the Debtor and DIP Factor. Funding to be extended under the DIP Factor Facility shall be deemed to have been so allowed, sold, advanced, made, and used or extended in good faith, and for valid business purposes and uses within the meaning of section 364(e) of the Bankruptcy Code. Accordingly, the DIP Factor is entitled to the protection and benefits of section 364(e) of the Bankruptcy Code and this Order and will not be affected by any subsequent reversal, modification, vacatur, amendment, re-argument or reconsideration of this Order or any other order.

G. *Adequate Protection.* The adequate protection provided herein and other benefits and privileges contained herein are consistent with and authorized by the Bankruptcy Code and are necessary in order to obtain the consent or non-objection of parties.

H. *Notice.* Notice of the Hearing and the relief requested in the Motion has been provided by the Debtor, whether by facsimile, email, overnight courier or hand delivery, to certain parties in interest, including: (i) the Office of the U.S. Trustee; (ii) the Internal Revenue Service; (iii) Debtor's twenty (20) largest unsecured creditors; (iv) counsel to Huntington; (v) counsel to the DIP Factor; (vi) counsel to the purported secured claimants; (vii) all parties who have filed a notice of appearance and requested service of pleadings in the Case; (viii) applicable state and local taxing authorities; (ix) counsel to CFI; and (x) all other parties entitled to received notice pursuant to Bankruptcy Rule 4001(c) and (d). The parties have made reasonable efforts to afford the best notice possible under the circumstances and the notice provided complies with the Bankruptcy Rules and Local Rules.

**NOW, THEREFORE, IT IS HEREBY ORDERED**, effective immediately, that:

1. **Granting of Motion**. The Motion is granted in its entirety subject to the provisions hereof. Any objections to the relief sought in the Motion that have not been previously resolved or

withdrawn are hereby overruled on their merits. This Order shall become effective immediately upon its entry.

2. **Authorization to Sell Accounts Receivable**. Until the earlier of (a) the maturity of the Contract Term or (b) the Termination Date (defined below), and subject to the terms, conditions and limitations on availability in the DIP Factor Documents, the DIP Factor Facility, and this Order, the Debtor is hereby authorized (i) to enter into the DIP Term Sheet, substantially in the form filed with the Court, with such modifications as permitted by this Order, and the other DIP Factor Documents and (ii) sell Accounts to the DIP Factor pursuant to the terms of the DIP Term Sheet and—after deduction by DIP Factor of amounts allowed under the DIP Factor Documents, including, but not limited to, the applicable discount fee, and such reserve that DIP Factor may elect to retain—use the corresponding advances thereof in its operations. Notwithstanding the grant of security interests in favor of the DIP Factor as provided in this order and in the DIP Factor Documents, the DIP Factor shall be the absolute owner of any Accounts purchased in accordance with this order or the DIP Factor Documents, free of any claims and interests. As provided in the DIP Term Sheet, the DIP Factor Documents may be amended, modified, supplemented or the provisions thereof waived in accordance with their terms, without further order of this Court; provided, however, that notice of any (i) increase in the aggregate of amount of the facility thereunder, (ii) increase in the discount fees or applicable interest rates charged, other than increases described in the Motion or in the DIP Factor Documents as filed with this Court, or (iii) the addition of financial covenants or financial events of default that are on terms materially more onerous or burdensome to the Debtor, other than modifications described in the Motion or in the DIP Factor Documents as filed with this Court, shall be provided to the United States Trustee and such party shall have five (5) days from the date of such notice within which to object in writing to such amendment, modification or supplement, and upon any such timely written objection, such amendment,

modification or supplement shall only be permitted upon the written consent of the objecting party or following entry of an order of this Court approving or authorizing such amendment, modification or supplement. The DIP Factor, through its counsel, shall provide a copy of the proposed post-petition DIP Factor Agreement to the United States Trustee as soon as practicable prior to the Hearing once the DIP Factor, and the Debtor have reached agreement concerning the terms and provisions of same, unless it has already been signed.

3.  **Discretion to Advance; Expiration**. Provided no Event of Default has occurred, the DIP Factor facility shall continue until the earlier of (i) one year upon the entry of this Order or (ii) the effective date of a plan of reorganization. Notwithstanding the foregoing and the absence of any Event of Default being declared and only to the extent provided under the DIP Factor Agreement and according to the customary ordinary course of business practice of the DIP Factor and the Debtor, the DIP Factor may decide, in its sole discretion, to accept or reject any Account offered for sale and to decline to advance the purchase price for such Account.

4.  **DIP Super Priority Claim**. Other than statutory fees owing to the U.S. Trustee the DIP Factor on account of the DIP Obligations is hereby granted a super-priority claim (the "Super Priority Claim") that shall have priority under sections 364(c)(l), 503(b) and 507(b) of the Bankruptcy Code over all administrative expense claims and unsecured claims against the Debtor and the Debtor's estate, now existing or hereafter arising, of any kind or name whatsoever including, without limitation, administrative expenses of the kinds specified in or ordered pursuant to sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726(b), 1113, and 1114 of the Bankruptcy Code.

5.  **DIP Liens and DIP Collateral**. Effective immediately upon the execution of this Order, pursuant to sections 361, 362, 364(c)(2), 364(c)(3), and 364(d) of the Bankruptcy Code, the DIP Factor

is hereby granted valid, binding, enforceable, non-avoidable and automatically and properly perfected security interests in and liens on (the "DIP Liens") all assets of the Debtor, now owned or hereafter acquired, and their proceeds (collectively, the "DIP Collateral"), including, but not limited to: (i) all post-petition Accounts and related general intangibles whether now existing or hereafter acquired or arising, all interest of replevin held by the Debtor arising in goods, the sale of which gave rise to any Account; (ii) all documents, chattel paper, instruments and general intangibles relating to the foregoing; (iii) all books and records pertaining to all of the foregoing, including but not limited to computer programs, data and lists; (iv) any and all presently owned and hereafter acquired personal property, real property and other assets of the Debtor, whether owned or consigned by or to, or leased from or to the Debtor, including, without limitation, all property of the Debtor, all proceeds and products of the foregoing and commercial tort claims; provided, however, the DIP Collateral does not include liens on avoidance actions or claims arising under chapter 5 of the Bankruptcy Code.

6.     **DIP Lien Priority**. The DIP Liens securing the DIP Obligations shall be senior in priority and superior to any security, mortgage, collateral interest, lien or claim on or to any of the DIP Collateral as to accounts and their proceeds, whether prepetition or postpetition, and junior in payment and priority to all other DIP Collateral.   The DIP Liens shall not be made subject to or *pari passu* with any lien or security interest heretofore or hereinafter granted in the Case or any case under chapter 7 of the Bankruptcy Code upon the conversion of the Case, or in any other proceedings superseding or related to any of the foregoing (collectively, "Successor Case"). The DIP Liens shall be valid and enforceable against any trustee or other estate representative appointed in the Case or any Successor Case, and/or upon the dismissal of the Case or Successor Case. The DIP Liens shall not be subject to sections 506(c), 510, 549, or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of any estate pursuant to section 551 of the Bankruptcy Code shall be made *pari passu* with

or senior to the DIP Liens. Notwithstanding any provisions of any agreement, instrument, document, the Uniform Commercial Code, or any other relevant law or regulation of any jurisdiction, no further notice, filing, or other act shall be required to affect such perfection.

7. **Adequate Protection to Huntington and the purported secured claimants**. Huntington National Bank and the purported secured claimants are hereby provided with the following forms of adequate protection pursuant to sections 361, 363(c), 363(e) and 364(d), to preserve their respective interests in the collateral (including the Cash Collateral) securing their respective prepetition facilities, to the extent of any diminution in the value of such interests, as a result of (a) the use of their Cash Collateral, (b) diminution in the value of the prepetition collateral arising the Debtor's use, sale or disposition of prepetition collateral and the imposition of the automatic stay pursuant to Bankruptcy Code section 362 (collectively, the "Diminution Claim"):

(i) *Replacement Liens:* To the extent of the Diminution Claim, if any, replacement liens (collectively, the "Adequate Protection Liens") on all DIP Collateral, subject and subordinate in all respects to the DIP Liens.

(ii) *Adequate Protection Payments.* The Huntington National Bank and the purported secured claimants shall be entitled to adequate protection payments to the extent provided in the Budget.

8. **Section 551; No Subordination or Pari Passu Liens**. The DIP Liens shall not be (i) subject to any lien that is avoided and preserved for the benefit of the Debtor's estate under section 551 of the Bankruptcy Code, or (ii) except as provided herein, subordinated to or made *pari passu* with any other lien under section 364(d) of the Bankruptcy Code or otherwise. No claim or lien having a priority superior to or pari passu with the DIP Liens or the Super Priority Claim granted by this Order with respect to the DIP Obligations, shall be granted or allowed.

30

9.    **Authorization to Pay Fees**. Any and all fees paid or required to be paid in connection with the DIP Factor Documents (including, but not limited to, the fees and expenses of the DIP Factor, service fees and due diligence fee) are hereby authorized and shall be paid as set forth in the DIP Term Sheet or contained in the DIP Factor Documents filed with the Court.

10.    **No Obligation to Purchase Accounts or Extend Credit**. The DIP Factor shall have no obligation to purchase Accounts or make any loan or advance under the DIP Factor Documents, unless all of the conditions precedent to the making of such extension of credit under the applicable DIP Factor Documents and this Order have been satisfied in full or waived by the DIP Factor in its sole discretion.

11.    **Use of DIP Factor Facility Proceeds; Payment of Prepetition Obligations**. From and after the Petition Date, the Debtor shall use funds and advances of credit under the DIP Factor Facility only for the purposes specifically set forth in this Order, the DIP Factor Documents and in compliance with the Budget, a copy of which is attached to the motion in support of entry of this Order. Notwithstanding any first-day orders entered authorizing the Debtor to pay any prepetition or other expenses, all such payments shall be made in accordance with the Budget. The Debtor shall be authorized to use the proceeds of the DIP Factor Facility only for payment of such items as are set forth in the Budget and subject to the terms and conditions set forth in the DIP Factor Documents and this Order. The Budget shall be revised by the end of each month during the period of this Order, and which shall remain subject to the consent of the DIP Factor each month. Not later than the second (2nd) business day of each week commencing with the second week of the period covered by the Budget, the Debtor shall provide the DIP Factor with a variance report reflecting, on a line-item basis, the actual cash disbursements and revenues for the preceding week and the percentage variance (the "Variance Percent") of such actual disbursements and revenues from those reflected in the Budget for that period.

Any disbursement by the Debtor other than for budgeted amounts as set forth in the Budget shall constitute an Event of Default in accordance with the provisions of this Order unless the DIP Factor consents to those changes in writing; provided, however, that the Debtor may make payments in excess of the total budgeted disbursements so long as the Variance Percent of the aggregate of all actual disbursements for each week shall not exceed ten percent (10.0%) of the budgeted disbursements for that week. For the avoidance of doubt, any amount included in the Budget that is not incurred or paid during a particular week shall be permitted to be carried over into subsequent weeks of the Budget.

12. **Modification of Automatic Stay**. The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified with respect to the Debtor and its estate to the extent necessary to effectuate all of the terms and provisions of this Order, including, without limitation, to: (a) permit the Debtor to grant the DIP Liens, Adequate Protection Liens, Super Priority Claim; (b) permit the Debtor to incur all liabilities and obligations under the DIP Factor Documents, the DIP Factor Facility and this Order; (c) permit the Debtor to perform such other acts as are necessary to effectuate the terms of this Order; and (d) authorize the Debtor to pay the DIP Factor; (e) to enable the DIP Factor to file any financing statements, deeds of trust, mortgages or other instruments and documents, if any, evidencing its security interests in and liens on the DIP Collateral; (f) to collect and apply the Debtor's Accounts.

13. **Perfection of DIP Liens**. This Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the DIP Liens without the necessity of filing or recording any financing statement or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action (including, for the avoidance of doubt, entering into any deposit account control agreement) to validate or perfect (in accordance with applicable non-bankruptcy law) the DIP Liens, or to entitle the DIP Factor to the priorities granted herein. Notwithstanding the foregoing, the DIP Factor is authorized to file, as it deems necessary in its

sole discretion, such financing statements, mortgages, notices of liens and other similar documents to perfect in accordance with applicable non-bankruptcy law or to otherwise evidence the applicable DIP Liens, and all such financing statements, mortgages, notices and other documents shall be deemed to have been filed or recorded as of the Petition Date; provided, however, that no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and/or the Adequate Protection Liens. The Debtor is authorized and directed to execute and deliver promptly upon demand to the DIP Factor, all such financing statements, mortgages, notices and other documents as any of the DIP Factor may reasonably request. The DIP Factor, in its discretion, may file a photocopy of this Order as a financing statement with any filing or recording office or with any registry of deeds or similar office, in addition to or in lieu of such financing statements, notices of lien or similar instrument.

14. **Proceeds of Subsequent Sale or Financing**. If the Debtor, any trustee, any examiner with enlarged powers, any responsible officer or any other estate representative subsequently appointed in this Case or any Successor Case, shall obtain credit or incur debt pursuant to sections 364(b), 364(c) or 364(d) of the Bankruptcy Code in violation of the DIP Factor Documents at any time prior to the repayment in full of all DIP Obligations and the termination of the DIP Factor's obligation to purchase Accounts or extend credit under the DIP Factor Facility, then all the cash proceeds derived from such credit or debit shall immediately be turned over to the DIP Factor to be applied as set forth in the DIP Factor Documents.

15. **Maintenance of DIP Collateral**. Until the payment in full in cash of all DIP Obligations, and the termination of the DIP Factor's obligations to purchase Accounts or extend credit under the DIP Factor Facility, the Debtor shall insure the DIP Collateral as required under the DIP Factor Facility.

16.     **Disposition of DIP Collateral; Rights of DIP Factor**. The Debtor shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral without the prior written consent of the DIP Factor.

17.     **DIP Termination**. On the Termination Date all DIP Obligations shall be immediately due and payable and all commitments to extend credit under the DIP Factor Facility will terminate.

18.     **Events of Default**. The occurrence of any of the following events of default (subject to any extensions or waivers as permitted under the DIP Factor Documents), or a default under the terms and conditions of this Order shall constitute an event of default under this Order, unless expressly waived in writing by the DIP Factor (collectively, the "<u>Events of Default</u>"):

(i)     The failure of Debtor to punctually and properly observe, keep or perform many covenant, agreement or condition of the Documents required to be observed, kept or performed in all material respects; or required under any other agreement or contract that may be executed between (a) Debtor and DIP Factor and/or (b) Debtor and CFI, in each case subject to any applicable grace periods and cure rights).

(ii)    A representation or warranty made by Debtor in the DIP Factor Documents purporting to represent the financial condition of Debtor is untrue or incorrect in any material respect (without duplication of any materiality qualifier contained therein) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date.

(iii)   The failure of Debtor to, within ten (10) business days, deliver to DIP Factor a remittance received by Debtor in payment of a purchased Account.

(iv)    The failure of Debtor to pay any DIP Obligations owed by Debtor to DIP Factor any under any of the DIP Factor Documents when due and payable, in each case subject to

34

any applicable grace periods and cure rights.

(v)     The failure of Debtor to pay any obligations owed by Debtor to CFI under any orders of this Court when due and payable, in each case subject to any applicable grace periods and cure rights.

(vi)    A levy or notice of attachment, execution(s), tax lien(s) or assessment(s) or similar process is issued against the Accounts of Debtor or any other DIP Collateral, but in such case only to the extent such encumbrance primes the DIP Factor's security interest or otherwise adversely affects the rights and remedies of the DIP Factor.

(vii)   Debtor's allegation in any pleading or other writing, or the finding or conclusion by the Bankruptcy Court, that any agreement, loan or security document of the DIP Factor and/or CFI is not valid, binding or enforceable.

(viii)  Entry of an Order dismissing the Debtor's bankruptcy case or converting it to one under chapter 7 of the Bankruptcy Code.

(ix)    Appointment of a chapter 11 trustee or examiner with enlarged powers relating to the operation of the business of the Debtor.

(x)     Any default under any cash collateral or financing order.

(xi)    The filing (with respect to all plans of reorganization filed by the Debtor) or confirmation (with respect to all plans filed by any person or entity other than the Debtor) of a plan of reorganization which contains a treatment of the postpetition obligations under the DIP Factor Facility in a manner inconsistent with that provided for in the DIP Factor Documents, or, which, at a minimum, does not provide for the indefeasible payment in full of the DIP Obligations under the DIP Factor Documents by a date or time any later than the "effective date" of such plan.

35

(xii)    The entry of an order authorizing the sale of all or substantially all of the assets of the Debtor which does not provide that the proceeds of sale, net of the costs approved by the DIP Factor, if any, of the DIP Collateral are paid to the DIP Factor.

19.    **Rights and Remedies Upon Event of Default**. Immediately upon the occurrence and during the continuation of an Event of Default (the "Termination Date"), (i) the DIP Factor may declare all DIP Obligations owing under the DIP Factor Documents to be immediately due and payable, (ii) any further commitment of the DIP Factor to purchase Accounts or extend credit may be terminated, restricted, or reduced, (iii) exercise its rights as a secured party and enforce the DIP Liens pursuant to applicable law, including, but not limited to, the right of DIP Factor to establish contact with and instruct any and all Account debtors to remit payment(s) due or to become due arising from the sale of merchandise or rendering of services directly to DIP Factor, and (iv) the DIP Factor Agreement and any other DIP Factor Documents shall be terminated as to any future liability or obligation of the DIP Factor, but without affecting any of the DIP Liens or the DIP Obligations. On the Termination Date, the DIP Obligations shall be due and payable, without notice or demand. Any automatic stay otherwise applicable to the DIP Factor is hereby modified so that the DIP Factor shall be entitled to exercise all rights and remedies against the DIP Collateral in accordance with the DIP Factor Documents and this Order and shall be permitted to satisfy the DIP Obligations and Super Priority Claims. Unless the Court orders otherwise, the automatic stay shall automatically be terminated without further notice or order, and the DIP Factor shall be permitted to exercise all remedies set forth herein, in the DIP Factor Documents and as otherwise available at law against the DIP Collateral, without any further order of or application or motion to the Court, and without restriction or restraint by any stay under sections 362 or 105 of the Bankruptcy Code, or otherwise, against the enforcement of the liens and security interest in the DIP Collateral or any other rights and remedies granted to the DIP Factor with respect thereto pursuant to the DIP Factor Documents or this Order. In the event any entity obtains relief from the automatic stay to foreclose on DIP Collateral, CFI will at the same time have any stay relief necessary to protect its interest in any DIP Collateral upon which any party obtains stay relief to

36

foreclose.

20. **Right to Credit Bid**. The DIP Factor shall have the right to "credit bid" the amount of the DIP Obligations as of the date of such bid during any sale of all or substantially all of the Debtor's assets to the extent it includes the sale of any collateral, including without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(iii) of the Bankruptcy Code.

21. **Dismissal of Case**. If an order dismissing this case under section 1112 of the Bankruptcy Code or otherwise (including under section 707 of the Bankruptcy Code) is at any time entered, such order shall provide (in accordance with sections 105 and 349(b) of the Bankruptcy Code) that (i) the claims and liens granted pursuant to this Order to or for the benefit of the DIP Factor shall continue in full force and effect and shall maintain their priorities as provided in this Order until all DIP Obligations in respect thereof shall have been indefeasibly paid in full in cash and satisfied in the manner provided in the DIP Factor Documents (and that such claims and liens shall, notwithstanding such dismissal, remain binding on all parties in interest), (ii) prior to dismissal, the Debtor shall deliver to the DIP Factor and record, at the Debtor's cost, such financing statements, mortgages and other documentation evidencing perfected liens in the DIP Collateral as the DIP Factor shall reasonably request, and to the extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such claims and liens.

22. **Binding Nature of Stipulations and Order**. The Debtor's Stipulations above shall be binding upon the Debtor and any other parties in interest

23. **Good Faith Under Section 364(e) of the Bankruptcy Code; No Modification or Stay of this Order**. Through the date hereof, the DIP Factor has acted in good faith in connection with negotiating the DIP Factor Documents, purchasing Accounts and extending credit under the DIP Factor Documents, and its reliance on this Order is in good faith. Based on the findings set forth in this Order and the record made during the Hearing, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Order are hereafter reversed, modified, amended

37

or vacated by a subsequent order of this Court or any other court, the DIP Factor is entitled to the protections provided in section 364(e) of the Bankruptcy Code.

24.     **Indemnification of DIP Factor**. The Debtor shall indemnify and hold harmless the DIP Factor from and against any and all damages, losses, settlement payments, obligations, liabilities, claims, actions or causes of action, whether groundless or otherwise, and reasonable costs and expenses incurred, suffered, sustained or required to be paid by an indemnified party of every nature and character arising out of or related to the DIP Factor Documents or the transactions contemplated thereby and by this Order, whether such indemnified party is party thereto, as provided in and pursuant to the terms of the DIP Factor Documents and as further described therein and herein (including attorneys' fees incurred in connection with the DIP Factor Documents and this Order), except to the extent resulting from such indemnified party's fraud, gross negligence, or willful misconduct as determined by a final nonappealable order of a court of competent jurisdiction. The indemnity includes indemnification for the DIP Factor's exercise of discretionary rights granted under the DIP Factor Facility. In all such litigation, or the preparation therefor, the DIP Factor shall be entitled to select its own counsel and, in addition to the foregoing indemnity, the Debtor agrees to promptly pay the reasonable fees and expenses of such counsel.

25.     **Reporting Requirements**. Debtor shall observe and comply with all of the financial reporting and performance covenants and conditions set forth in the Documents.

26.     **Rights of Access and Information**. Without limiting the rights of access and information afforded the DIP Factor under the DIP Factor Documents, the Debtor shall be, and hereby are, required to afford representatives, agents and/or employees of the DIP Factor reasonable access to the Debtor's premises and its books and records in accordance with the DIP Factor Documents, and shall reasonably cooperate, consult with, and provide to such persons all such information as may be

38

reasonably requested. In addition, the Debtor authorizes its independent certified public accountants, financial advisors, and consultants to cooperate, consult with, and provide to the DIP Factor all such information as may be reasonably requested with respect to the business, results of operations and financial condition.

27.    **Rights Reserved**. Notwithstanding anything herein to the contrary, the entry of this Order is without prejudice to, and does not constitute a waiver of expressly or implicitly, or otherwise impair any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Factor, all of which are preserved.

28.    **No Waiver by Failure to Seek Relief**. The failure of the DIP Factor or CFI to seek relief or otherwise exercise its rights and remedies under this Order, the Documents, or applicable law, as the case may be, shall not constitute a waiver of any of the rights hereunder, thereunder, or otherwise.

29.    **Debtor Authorized and Directed to Execute Documents and Pay Fees**. The Debtor is authorized and directed, and the automatic stay imposed by section 362 of the Bankruptcy Code is hereby modified to the extent necessary, to (a) do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the DIP Factor Documents and such additional security agreements, pledge agreements, control agreements, mortgages and financing statements and other documents and instruments as may be necessary or appropriate to better evidence and perfect the DIP Factor Facility, (b) pay all principal, interest, fees and expenses and other amounts described in the DIP Term Sheet as such become due and without the need for further Court approval, including, without limitation, facility fees, administration fees, and the fees and expenses of the attorneys, advisers, and consultants engaged or to be engaged by DIP Factor to the extent provided in the DIP Term Sheet. None of such fees and expenses shall be subject to the approval of this Court or

the United States Trustee Guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court.

30. **Post-Petition Obligations Not Subject to Setoff**. The DIP Obligations and the claims and liens granted to or for the benefit of the DIP Factor pursuant to this Order and the other DIP Factor Documents, are not subject to any setoff, reduction or disallowance of any kind, including, without limitation, under section 502(d) of the Bankruptcy Code.

31. **Proof of Claim**. The DIP Factor may, but shall not be required to, file a proof of Claim in the Case.

32. **Limitations on the DIP Facility and DIP Collateral**. The DIP Facility and DIP Collateral (including Cash Collateral) may not be used: (a) in connection with or to finance in any way any action, suit, arbitration, proceeding, application, motion or other litigation of any type (i) adverse to the interests of the DIP Factor or CFI, or their rights and remedies under the Documents or this Order, as applicable, including, without limitation, for the payment of any services rendered by the professionals retained by the Debtor in connection with the assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment determination, declaration or similar relief (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, the DIP Obligations, (iii) for monetary, injunctive or other affirmative relief against DIP Factor or CFI, or (iv) preventing, hindering or otherwise delaying the exercise by the DIP Factor or CFI of any rights and/or remedies under this Order, the Documents, or applicable law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the Court or otherwise) by the DIP Factor or CFI upon any of the DIP Collateral; (b) to make any distribution under a plan of reorganization in the Case; (c) to make any payment in settlement of any claim, action or proceeding,

40

before any court, arbitrator or other governmental body without the prior written consents required of DIP Factor; (d) to pay any fees or similar amounts to any person who has proposed or may propose to purchase interests in the Debtor without the prior written consents of DIP Factor, (e) to object to, contest, or interfere with in any way the DIP Factor's enforcement or realization upon any of the DIP Collateral once an Event of Default has occurred; (f) to use or seek to use any insurance proceeds constituting DIP Collateral without the consent of the DIP Factor; (g) to incur debt outside the ordinary course of business without the prior consent of the DIP Factor; (h) to object to or challenge in any way the claims, liens, or interests (held by or on behalf of any DIP Factor or CFI; (i) to assert, commence or prosecute any claims or causes of action whatsoever, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against DIP Factor or CFI; (j) to prosecute an objection to, contest in any manner, or raise any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any of the DIP Obligations, DIP Liens, or any other rights or interests of DIP Factor and CFI; or (k) to prevent (or attempt to prevent), hinder or otherwise delay the exercise by DIP Factor and CFI of any rights and remedies granted under this Order.

33. **No Deemed Control**. In making decisions to advance any extensions of credit under the DIP Factor Facility, or in taking any other actions related to this Order or the DIP Factor Documents (including, without limitation, the exercise of its approval rights with respect to any budget), DIP Factor shall have no liability to any third party and shall not be deemed to be in control of the operations of Debtor or to be acting as "controlling person," "responsible person," or "owner or operator" with respect to the operation or management of Debtor (as such term, or any similar terms, are used in the Internal Revenue Code, the United States Comprehensive Environmental Response, Compensation and Liability Act as amended, or any similar federal or state statute), and DIP Factor's relationship with Debtor shall not constitute or be deemed to constitute a joint venture or partnership of

41

any kind.

34.     **Final Order Effective Immediately**. This Order is hereby deemed effective immediately pursuant to Bankruptcy Rule 6004(h).

35.     **No Third-Party Rights**. Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

36.     **Section 506(c) Claims**. No costs or expenses of administration which have been or may be incurred in the Case or any Successor Case at any time shall be charged against any the DIP Factor, its claims or the DIP Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, or otherwise, without the prior written consent of the DIP Factor and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Factor.

37.     **No Marshaling/Applications of Proceeds**. The DIP Factor shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral, and proceeds shall be received and applied pursuant to DIP Factor Documents.

38.     **Section 552(b)**. The DIP Factor shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to any of them with respect to proceeds, product, offspring or profits of any of their respective collateral.

39.     **Discharge Waiver**. The DIP Obligations shall not be discharged by the entry of an order (a) confirming a chapter 11 plan in this case (and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor hereby waives such discharge) or (b) converting this case to one under chapter 7 of the Bankruptcy Code. Under no circumstances shall any chapter 11 plan in this case be confirmed or become effective unless such plan provides that the DIP Obligations shall be indefeasibly

paid in full in cash and satisfied in the manner provided in the DIP Factor Documents on or before the effective date of such plan.

40.     **Binding Effect of Final Order**. Immediately upon entry by this Court (notwithstanding any applicable law or rule to the contrary), the terms and provisions of this Order shall become valid and binding upon and inure to the benefit of the Debtor, the DIP Factor,  CFI, all other creditors of the Debtor, any Statutory Committee or any other court appointed committee appointed in the Case, and all other parties in interest and their respective successors and assigns, including any trustee or other fiduciary hereafter appointed in the Case, any Successor Case, or upon dismissal of the Case or Successor Case.

41.     **No Modification of Final Order**. An Event of Default hereunder shall occur if, until and unless the DIP Obligations have been indefeasibly paid in full in cash, and all commitments to extend credit under the DIP Factor Facility have been terminated, the Debtor seeks or consents to, directly or indirectly: (a) without the prior written consent of the DIP Factor, (i) any modification, stay, vacatur or amendment to this Order; or (ii) a priority claim for any administrative expense or unsecured claim against the Debtor (now existing or hereafter arising of any kind or nature whatsoever, including, without limitation any administrative expense of the kind specified in sections 503(b), 507(a) or 507(b) of the Bankruptcy Code) in the Case or any Successor Case, equal or superior to the Super Priority Claim; and (b) without the prior written consent of the DIP Factor, any lien on any of the DIP Collateral with priority equal or superior to the DIP Liens. An Event of Default shall occur if the Debtor seeks any amendment, modification or extension of this Order without the prior written consent of the DIP Factor, and no such consent shall be implied by any other action, inaction or acquiescence of the DIP Factor.

42.     **Final Order Controls**. In the event of any inconsistency between the terms and

conditions of the DIP Factor Documents or this Order, the provisions of this Order shall govern and control.

43. **Survival**. The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered: (a) confirming any plan of reorganization in the Case; (b) converting the Case to a case under chapter 7 of the Bankruptcy Code; (c) dismissing the Case or any Successor Case; or (d) pursuant to which this Court abstains from hearing of the Case or Successor Case. The terms and provisions of this Order, including the claims, liens, security interests and other protections granted to the DIP Factor and CFI, pursuant to this Order and/or the DIP Factor Documents, notwithstanding the entry of any such other order, shall continue in the Case, in any Successor Case, or following dismissal of the Case or any Successor Cases, and shall maintain their priority as provided by this Order until all DIP Obligations have been indefeasibly paid in full. The terms and provisions concerning the indemnification of the DIP Factor shall continue in this Case, in any Successor Cases, following dismissal of this Case or any Successor Case, following termination of the DIP Factor Documents and/or the repayment of the DIP Obligations.

44. **Effect of this Order**. This Order shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and shall take effect and be enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof.

45. **Retention of Jurisdiction**. The Court has and will retain jurisdiction to enforce this Order according to its terms.

44

# EXHIBIT D

PROJECTED CASH FLOWS FOR FIRST SIX MONTHS POST PETITION

| | Oct | | Nov | | Dec | Jan 2019 | Feb | Mar |
|---|---|---|---|---|---|---|---|---|
| REVENUES | **254,523.85** | *1 | **353,723.85** | *4 | **353,723.85** | **353,723.85** | **353,723.85** | **353,723.85** |
| SALES - SORTING/REWORK | 0.00 | | 0.00 | | 0.00 | 0.00 | 0.00 | 0.00 |
| MISCELLANEOUS INCOME | | | | | | | | |
| | 254,523.85 | | 353,723.85 | | 353,723.85 | 353,723.85 | 353,723.85 | 353,723.85 |
| TOTAL REVENUES | | | | | | | | |
| | | | | | | | | |
| COST OF SALES | 30,538.89 | *2 | 30,538.89 | | 30,538.89 | 30,538.89 | 30,538.89 | 30,538.89 |
| MANAGEMENT | 1,914.90 | | 43,514.90 | *5 | 43,514.90 | 43,514.90 | 43,514.90 | 43,514.90 |
| MS - INSPECTORS | 14,432.23 | *3 | 14,432.23 | | 14,432.23 | 14,432.23 | 14,432.23 | 14,432.23 |
| MI - INSPECTORS | 0.00 | | 0.00 | | 0.00 | 0.00 | 0.00 | 0.00 |
| GA - INSPECTORS | 0.00 | | 0.00 | | 0.00 | 0.00 | 0.00 | 0.00 |
| SC - INSPECTORS | 2,057.07 | | 2,057.07 | | 2,057.07 | 2,057.07 | 2,057.07 | 2,057.07 |
| CONTRACT - 1099 | 680.00 | | 680.00 | | 680.00 | 680.00 | 680.00 | 680.00 |
| SUPERVISOR - MISSISSIPPI | 4,924.80 | | 4,924.80 | | 4,924.80 | 4,924.80 | 4,924.80 | 4,924.80 |
| SUPERVISOR - TACOM | 3,715.40 | | 3,715.40 | | 3,715.40 | 3,715.40 | 3,715.40 | 3,715.40 |
| SUPERVISORS-MI | 0.00 | | 0.00 | | 0.00 | 0.00 | 0.00 | 0.00 |
| SC - SUPERVISORS | 18,005.19 | | 18,005.19 | | 18,005.19 | 18,005.19 | 18,005.19 | 18,005.19 |
| CLERKS - TACOM | 2,508.91 | | 2,508.91 | | 2,508.91 | 2,508.91 | 2,508.91 | 2,508.91 |
| GOV VA-MEDICAL COURIER | 2,380.00 | | 2,380.00 | | 2,380.00 | 2,380.00 | 2,380.00 | 2,380.00 |
| SUPERVISORS-MS | 4,928.40 | | 4,928.40 | | 4,928.40 | 4,928.40 | 4,928.40 | 4,928.40 |
| INSPECTOR - TACOM | 0.00 | | 0.00 | | 0.00 | 0.00 | 0.00 | 0.00 |
| STAFFING-MI | 4,202.56 | | 4,202.56 | | 4,202.56 | 4,202.56 | 4,202.56 | 4,202.56 |
| STAFFING - CANADA | 5,592.33 | | 5,592.33 | | 5,592.33 | 5,592.33 | 5,592.33 | 5,592.33 |
| STAFFING-MISSISSIPPI | 3,600.00 | | 3,600.00 | | 3,600.00 | 3,600.00 | 3,600.00 | 3,600.00 |
| OFFICE - HQ PERSONNEL | 36,502.35 | | 36,502.35 | | 36,502.35 | 36,502.35 | 36,502.35 | 36,502.35 |
| LIAISONS - FIELD | 2,149.20 | | 2,149.20 | | 2,149.20 | 2,149.20 | 2,149.20 | 2,149.20 |
| QUALITY TECH | 1,904.00 | | 1,904.00 | | 1,904.00 | 1,904.00 | 1,904.00 | 1,904.00 |
| PART PROCESSOR | 2,653.28 | | 2,653.28 | | 2,653.28 | 2,653.28 | 2,653.28 | 2,653.28 |
| QUALITY SPECIALIST | 1,770.95 | | 1,770.95 | | 1,770.95 | 1,770.95 | 1,770.95 | 1,770.95 |
| QUALITY ENGINEERS | 16,432.49 | | 16,432.49 | | 16,432.49 | 16,432.49 | 16,432.49 | 16,432.49 |
| PROJECT MANAGER | 14,033.69 | *3 | 14,651.17 | *5 | 14,651.17 | 14,651.17 | 14,651.17 | 14,651.17 |
| MED/SS PAYROLL TAXES | 82.31 | *3 | 85.93 | *5 | 85.93 | 85.93 | 85.93 | 85.93 |
| FUTA PAYROLL TAX | 1,189.25 | *3 | 1,241.57 | *5 | 1,241.57 | 1,241.57 | 1,241.57 | 1,241.57 |
| SUTA PAYROLL TAX | | | | | | | | |
| | 176,198.17 | | 218,471.60 | | 218,471.60 | 218,471.60 | 218,471.60 | 218,471.60 |
| TOTAL COST OF SALES | | | | | | | | |
| | 78,325.68 | | 135,252.25 | | 135,252.25 | 135,252.25 | 135,252.25 | 135,252.25 |
| GROSS PROFIT | | | | | | | | |
| | | | | | | | | |
| GENERAL EXPENSES | 0.00 | | 0.00 | | 0.00 | 0.00 | 0.00 | 0.00 |
| OUTSIDE COMMISSION | 209.99 | *3 | 59.99 | | 59.99 | 59.99 | 59.99 | 59.99 |
| ADVERTISING - EMPLOYMENT | 300.00 | *3 | 100.00 | | 0.00 | 0.00 | 0.00 | 0.00 |
| ADVERTISING - GENERAL BUSINESS | 3,525.74 | | 3,175.06 | | 2,261.39 | 2,261.39 | 2,261.39 | 2,261.39 |
| AUTO EXPENSE | 1,139.51 | | 400.00 | | 400.00 | 400.00 | 400.00 | 400.00 |
| BANK CHARGE | 217.50 | | 84.38 | | 75.00 | 75.00 | 75.00 | 75.00 |
| CONSULTING SERVICES | 536.93 | | 299.23 | | 196.11 | 196.11 | 196.11 | 196.11 |
| DONATIONS | 17.50 | | 4.38 | | 4.38 | 4.38 | 4.38 | 4.38 |
| DUES & SUBSCRIPTIONS | 5,154.32 | | 4,374.54 | | 3,082.54 | 3,082.54 | 3,082.54 | 3,082.54 |
| RENT - BUILDING | 0.00 | | 0.00 | | 0.00 | 0.00 | 0.00 | 0.00 |
| UTILITIES | 83.87 | | 62.90 | | 36.69 | 36.69 | 36.69 | 36.69 |
| GIFTS | 376.91 | | 94.23 | | 94.23 | 94.23 | 94.23 | 94.23 |
| INSURANCE - BUSINESS GENERAL | 3,645.83 | | 2,994.79 | | 2,018.23 | 2,018.23 | 2,018.23 | 2,018.23 |
| LIFE INSURANCE - OSSIE NUNN | 0.00 | | 0.00 | | 0.00 | 0.00 | 0.00 | 0.00 |
| INSURANCE - WORKERS' COMP | 728.16 | | 228.98 | | 211.97 | 211.97 | 211.97 | 211.97 |
| LEGAL AND ACCOUNTING | 85.00 | | 106.25 | | 79.69 | 79.69 | 79.69 | 79.69 |
| LICENSES AND FEES | 2,630.25 | | 2,131.05 | | 1,380.09 | 1,380.09 | 1,380.09 | 1,380.09 |

| Account | Col1 | | Col2 | | Col3 | Col4 | Col5 | Col6 |
|---|---|---|---|---|---|---|---|---|
| FOOD EXP | 0.00 | | 0.00 | | 0.00 | 0.00 | 0.00 | 0.00 |
| CORP. ENTERTAINMENT | 58.04 | | 14.51 | | 14.51 | 14.51 | 14.51 | 14.51 |
| OFFICE FURNITURE | 1,528.49 | | 1,355.15 | | 992.71 | 992.71 | 992.71 | 992.71 |
| OFFICE SUPPLIES | 959.64 | | 284.72 | | 259.83 | 259.83 | 259.83 | 259.83 |
| OUTSIDE SERVICES | 1,617.99 | | 1,372.79 | | 976.85 | 976.85 | 976.85 | 976.85 |
| PAYROLL SERVICES | 54.68 | | 45.79 | | 37.02 | 37.02 | 37.02 | 37.02 |
| POSTAGE & DELIVERIES | 151.97 | | 155.85 | | 117.07 | 117.07 | 117.07 | 117.07 |
| SECURITY ALARM - HEADQUARTERS | 401.99 | *3 | 300.00 | *5 | 300.00 | 300.00 | 300.00 | 300.00 |
| SHOP SUPPLIES | 593.93 | | 592.97 | | 441.57 | 441.57 | 441.57 | 441.57 |
| TELEPHONE - LAND LINE | 724.50 | | 676.59 | | 520.00 | 520.00 | 520.00 | 520.00 |
| TELEPHONE - CELL | 45.16 | | 38.36 | | 27.08 | 27.08 | 27.08 | 27.08 |
| PHONE CONFERENCE CALLS | 31.25 | | 26.56 | | 18.75 | 18.75 | 18.75 | 18.75 |
| CELLULAR REIMBURSEMENT-EMP. | 95.00 | | 71.25 | | 41.56 | 41.56 | 41.56 | 41.56 |
| TRAINING | 992.82 | | 641.85 | | 395.82 | 395.82 | 395.82 | 395.82 |
| TRAVEL - AIR | 417.85 | | 297.62 | | 239.68 | 239.68 | 239.68 | 239.68 |
| TRAVEL - MILEAGE GAS & PARKING | 1,069.10 | | 844.12 | | 570.41 | 570.41 | 570.41 | 570.41 |
| CAR RENTAL | (50.00) | | 0.00 | | 0.00 | 0.00 | 0.00 | 0.00 |
| TRAVEL ADVANCES | 1,177.66 | | 964.47 | | 658.07 | 658.07 | 658.07 | 658.07 |
| TRAVEL - LODGING | 19,887.74 | | 20,402.18 | | 14,836.74 | 14,836.74 | 14,836.74 | 14,836.74 |
| INTEREST EXPENSE-OTHER | 3,509.27 | | 3,420.94 | | 2,446.63 | 2,446.63 | 2,446.63 | 2,446.63 |
| INTEREST-L/C-HNB | 4,618.11 | | 4,274.52 | | 3,044.95 | 3,044.95 | 3,044.95 | 3,044.95 |
| INTEREST EXPENSE - ONDECK17 | 10.06 | | 12.57 | | 9.43 | 9.43 | 9.43 | 9.43 |
| UNIFORMS | 0.00 | | 0.00 | | 0.00 | 0.00 | 0.00 | 0.00 |
| TAXES - PAYROLL ADMIN | 0.00 | | 0.00 | | 0.00 | 0.00 | 0.00 | 0.00 |
| TAXES - OTHER | 3,872.19 | *3 | 3,333.00 | *5 | 1,927.24 | 1,927.24 | 1,927.24 | 1,927.24 |
| TAXES - FEDERAL INCOME | 891.48 | | 757.75 | | 534.89 | 534.89 | 534.89 | 534.89 |
| COMPUTER SOFTWARE-LICENSING | 781.25 | | 664.06 | | 468.75 | 468.75 | 468.75 | 468.75 |
| COMPUTER MAINT. | 561.50 | | 423.34 | | 308.20 | 308.20 | 308.20 | 308.20 |
| WEBSITE MAINT. & DEVELOPMENT | | | | | | | | |
| | 62,653.12 | | 55,086.73 | | 39,495.06 | 39,495.06 | 39,495.06 | 39,495.06 |
| TOTAL GENERAL EXPENSES | | | | | | | | |
| | 15,672.56 | | 80,165.51 | | 95,757.19 | 95,757.19 | 95,757.19 | 95,757.19 |
| NET CASH FLOW INCOME | | | | | | | | |
| | | | | | | | | |
| CHAPTER 11 ADMINISTRATIVE EXPENSES | 3,500.00 | | 3,500.00 | | 3,500.00 | 3,500.00 | 3,500.00 | 3,500.00 |
| LEGAL FEES PER RETAINER AGREEMENT | 1,950.00 | | | | | 7,472.18 | | |
| UNITED STATES TRUSTEE FEES (QUARTER | 5,450.00 | | 3,500.00 | | 3,500.00 | 10,972.18 | 3,500.00 | 3,500.00 |
| TOTAL CH. 11 ADMINSTRATIVE EXPENSES | | | | | | | | |
| | | | | | | | | |
| PROPOSED ADEQUATE PROTECTION PAYME | 5,000.00 | | 5,000.00 | | 5,000.00 | 5,000.00 | 5,000.00 | 5,000.00 |
| HUNTINGTON BANK NA. | 500.00 | | 500.00 | | 500.00 | 500.00 | 500.00 | 500.00 |
| ON DECK CAPITAL, INC. | 500.00 | | 500.00 | | 500.00 | 500.00 | 500.00 | 500.00 |
| FORWARD FINANCING | 500.00 | | 500.00 | | 500.00 | 500.00 | 500.00 | 500.00 |
| FUNDING METRICS D/B/A LENDINI | 500.00 | | 500.00 | | 500.00 | 500.00 | 500.00 | 500.00 |
| LG FUNDING LLC | 7,000.00 | | 7,000.00 | | 7,000.00 | 7,000.00 | 7,000.00 | 7,000.00 |
| TOTAL ADEQUATE PROTECTION PAYMENTS | | | | | | | | |
| | | | | | | | | |
| NET CASH FLOW AFTER ADMINISTRATIVE EXPENSES & PROPOSED ADEQUATE PROTECTION PAYMENTS | 3,222.56 | 0.00 | 69,665.51 | | 85,257.19 | 77,785.01 | 85,257.19 | 85,257.19 |